[No. 4507.]

Mow ET AL. v. The People.

1. **Murder—Evidence.**

Evidence examined and held sufficient to sustain a conviction for murder in the second degree.

2. **Murder—Principals and Accessories.**

Where two parties went into a store with the preconceived design of taking the life of a party therein and one of them shot and killed the party the other is equally guilty of murder although he did not fire a single shot.

3. **Appellate Practice—Verdicts—Evidence.**

The verdict of a jury will not be disturbed on appeal when the testimony and circumstances are such that different minds might conscientiously reach different conclusions as to the facts thereby established.

4. **Murder—Manslaughter—Instructions—Evidence.**

In a prosecution for murder where there is no evidence from which the jury would be justified in finding defendant guilty of manslaughter the trial judge is not required to instruct the jury upon manslaughter.

5. **Same—Failure to Request Instruction.**

In a prosecution for murder it is not reversible error to fail to instruct the jury upon manslaughter, where no request was made for such instruction.

6. **—Evidence—Photographs.**

The fact that a photograph was not taken by a professional photographer does not render it inadmissible in evidence. If it is otherwise competent it is only necessary to show that it is a correct likeness of the objects which it purports to represent, in order to warrant its admission in evidence, and this may be shown by any competent witness.

7. **Evidence—Hearsay—Non-Prejudicial.**

In a prosecution for murder a witness was asked if either of the defendants had said anything to him about an occurrence at the home of one of the defendants a night or two previous to the homicide to which he answered no. He was then asked if any of the defendant's family had said anything to him, about the occurrence, to which he answered yes, that a brother of defendant had spoken to him on the evening of the homicide. These questions were answered over objections by defendants. The witness was then asked what was said by defendants brother, to which an objection was made and sustained. Held, that the answers of witness were not prejudicial.

8. **Evidence—Non-Prejudicial—Appellate Practice.**

A verdict will not be set aside for errors committed in the admission of testimony when it appears that such testimony did not prejudice the parties against whom it was admitted.

*Error to the District Court of Fremont County.*

Mr. Joseph H. Maupin, Mr. Clyde C. Dawson and Mr. John G. Taylor, for plaintiffs in error.

The Attorney General and Mr. H. J. Hersey, for the people.

Mr. James T. Locke and Messrs. Patterson, Richardson & Hawkins, *amici curiae.*

Mr. Justice Gabbert delivered the opinion of the court.

Plaintiffs in error were charged with the murder of Charles J. Withers. The trial resulted in a conviction for murder in the second degee. The deceased came to his death from bullet wounds claimed on behalf of the people to have been inflicted by one or both of the accused. The theory of the defense was that the accused, Mow, was attacked by deceased without any provocation whatever, and that in defending himself he took the life of deceased. On the part of the prosecution, the theory was that the accused entered the storeroom where the homicide occurred, and at once opened fire upon the deceased.

The first point we shall consider is the claim of counsel on behalf of the accused that the testimony does not support the verdict as against either, and especially as against McCoy. There were but three eye witnesses to the tragedy—the accused, and a young man by the name of Hendricks, who was a clerk in the store. His testimony is to the effect that he was near the stove, in the rear of the store, when the accused entered a little after eight o'clock in the evening; that deceased was near by, leaning against some shelving, and as the accused walked towards them, he moved a short distance, which placed him in the rear of the stove, facing towards the front part of the store; that McCoy asked him (the witness) if he was going to the dance; that he does not remember Mow said anything more than "Good evening," and that he (the witness) told McCoy he did not think he would go. No reply was made to this, and as he

started to sit down a shot was fired. He was unable to tell who fired this shot. He immediately retreated behind a counter, at which time, as near as he could remember, Withers was moving towards the corner of the room. This corner was partitioned off and was occupied by the witness and deceased as a bed room. The last shot fired struck the witness, but as it had first passed through a counter, did not cause him any serious injury. Mow and McCoy testified that they were on their way to a dance, and stopped at the store for Mow to purchase a light pair of shoes. There is testimony corroborating this statement. Their evidence as to what was said when they first entered the storeroom was practically the same as detailed by the witness Hendricks. They both locate Withers in the room at a point back of the stove, facing the front of the store, and claim that after having spoken to Hendricks they heard the click of a gun, and looking around, discovered that Withers had drawn a revolver which he pointed and immediately fired at Mow; that the latter then pulled his gun and shot at Withers. Mow claims that this first shot blinded him, because it was fired in such close proximity to his head that it burned his eyes and face. He says that Withers commenced to retreat, and he followed him, firing as rapidly as he could; that the first shot he fired must have been in the direction of some pick-handles in a rack; that when his gun snapped he knew there were no longer any loads in it, and he then ran to the front of the store where he met McCoy. His weapon was a Colt's 45 calibre six-shooter. McCoy claims that when the first shot was fired, he immediately retreated to the front of the store, and was there when the firing ceased; that he was armed with a smaller calibre revolver than the others, but that he did not fire a single shot. That McCoy made a movement towards the front of the

store immediately after the first shot was fired is to some extent corroborated by the witness Hendricks, who indicated that he moved in that direction, but does not pretend to state where he did go. It will thus be seen at the outset that the vital question in the case was, Who fired the first shot? If, as contended on behalf of the accused, they were attacked by the deceased, then they only acted in self-defense. If, on the other hand, they opened fire on him, they must have gone to the store with the express purpose of taking his life if the opportunity was offered. The accused also introduced testimony tending to prove that deceased had made threats against Mow, but that they were ignorant of these threats at the time when the homicide occurred. Withers fell and expired almost immediately, near the stove. A 45 calibre revolver was found near his body, from which he had not fired more than four shots during the affray.

Two witnesses who were with the deceased at the storeroom for some time during the evening, and only left shortly before the tragedy, testified they did not notice that he was armed. They describe his dress, as well as the manner in which he was standing, from which it may fairly be inferred that if he had been armed with a weapon as large as a 45 calibre revolver, they would have noticed it. There is also testimony to the effect that deceased when at home was in the habit of keeping his revolver in the bed which he occupied in the store. One witness testified that he was in the storeroom from fifteen minutes to half an hour before the shooting occurred, and that while there he noticed McCoy come to the front of the store, peer through the glass in the front door, and then go away; and that he was accompanied by another party whom he did not recognize.

The above, in brief, is a statement of the material oral testimony in the case. It throws but little

light upon the question of who fired the first shot outside of the statements of the accused. In determining this vital question, however, we are aided very materially by the examination of a plat showing the bullet marks in the storeroom in connection with testimony regarding the direction from which the bullets causing them were fired, as exhibited by such marks. According to the testimony of all the eye witnesses, it appears that the deceased was standing in the rear of the store, facing towards the front, and that the accused were standing at or near the opposite end of the stove, behind which deceased was standing, and facing him. If, as contended, he fired the first shot, he must have done so from that position. There is no evidence of any bullet marks in the room which would have been made had he fired a shot while standing in the position claimed by the accused. The plat above referred to shows that almost immediately in the rear of where the deceased was standing at this time, and in line with the point where either one or the other of the accused were standing, that the mark of a bullet was found in the wall. According to the testimony of Mow, the deceased retreated in the direction of his bed room, and that he followed him. Mow claims that this first shot was the one which blinded him. If that were true, it is rather strange that in this condition he would follow the deceased on his retreat. Besides, it is fairly inferable from the plat, that if deceased fired the shot from where he was standing when the accused entered the room, and at Mow where he was standing, the distance was so great that Mow would not have been burned by the flash of the powder. The doctor says that the shot which caused this injury was fired very close to his face. If deceased was unarmed, that explains why he retreated towards his bed room, for, according to the testi-

mony, that is where he would have found his revolver. Mow says the first shot he fired was in the direction of the rack containing the pick handles. One of them was marked with a bullet. This rack was near the bed room door. This circumstance supports the theory of the prosecution, that Withers, when fired upon, retreated to his room for the purpose of securing his revolver. Blood stains were found on the floor of this room, which unmistakably point to the fact that deceased was in the room during the encounter. The plat shows a shot in the wall at an angle which might have been caused by the firing of a revolver from the bed room. Bullet marks also appear from which it is evident that two other shots were fired from the interior of the bed room which, in all probability, were fired by the deceased. Certainly neither of the accused could have fired these shots unless they first entered the bed room and fired from within, and in an outward direction. Two bullet marks were also found in the interior of this room, which must have been fired from a revolver pointed into it. With Mow, as he says, following the deceased, who unquestionably was in the room, these marks are easily accounted for as having been made by bullets fired at Withers. The deceased fell to the floor near the stove. The last shot fired, according to the testimony of Hendricks, was the one which wounded him. From the position in which the body of deceased was found, and the direction of the bullet, it is not at all improbable that this shot was fired by him at Mow, who says he started for the front part of the store as soon as he discovered that his revolver was empty.

On the part of the prosecution a witness testified that he found eleven bullet marks in the wall, but did not see the one in the pick handle. Whether or not he meant to state that from these marks he found

evidence of eleven shots having been fired, is not alto-
gether clear, although it would seem from the dia-
gram that this is what he meant, because on the dia-
gram which he prepared twelve marks are shown,
exclusive of the one in the pick handle; but in sev-
eral instances more than one mark was made by the
same bullet.

The testimony, although somewhat meager in
detail for a murder case, when carefully considered
and weighed, fully sustains the verdict of the jury
that the accused are guilty of the crime of which they
were convicted. Twelve men have carefully consid-
ered it. They had the advantage of seeing the wit-
nesses when they testified; of considering all those
little incidents which aid so much in the determina-
tion of contested questions of fact, and which can
never be reproduced in a record; of the explanations
which the witnesses gave of the surroundings where
the tragedy occurred, and if this court, without these
aids, should set aside the verdict and say that it is
not sustained by the testimony, it could only be done
upon the theory that we have a better understanding
of the case than the jury had. If the accused visited
the store for the purpose of purchasing a pair of
shoes for Mow, why did McCoy peer in through the
window and then disappear, and return later, except
it was that they desired to enter the room and murder
the deceased at a time when there was no eye witness
except the clerk? True, this testimony as to McCoy
peering into the store is denied, but the truth or fals-
ity of the statement made by the witnesses on behalf
of the people and of the accused on this subject was
for the jury to determine. The bullet marks sustain
the conclusion of the jury, that the story of the ac-
cused is without foundation. Not a mark of a bullet
is found which could have been fired by the deceased
until after he had reached his bed room, whereas,

taking into consideration the position of the parties to the tragedy at the time when the first shot was fired, and the subsequent movements of Mow and deceased, as detailed by the accused themselves, the conclusion is practically irresistible that one or the other of them fired it, and that at this time deceased was unarmed, for, according to their own testimony, he retreated towards his bed room, which is the very direction he would have gone to secure a weapon with which to defend himself against the murderous assault made upon him. At the oral argument it was suggested that the deceased may have retreated to his bed room for the purpose of securing his Winchester rifle, which was there at the time. The fact that he did enter the room and subsequently came out, armed only with a revolver, is convincing proof that he did not go to the bed room for the purpose of securing his rifle.

The claim that McCoy did not fire any of the shots is not borne out by the record. He and Mow were close and intimate friends. They had been brought up as boys together. When, according to the testimony of the accused, the deceased leveled his revolver at Mow, it does not seem probable that McCoy, who was armed, would have made no effort to save his friend. If we are right in concluding that the testimony shows marks of eleven different bullets, then McCoy must have fired once. The deceased according to the testimony only fired four shots. Mow fired six, and the other must have been fired by McCoy. Waiving this, however, if Mow is guilty, McCoy is equally so, because, if we accept the conclusion that the testimony is sufficient to sustain the verdict against Mow, there is no escape from the further one that they both went to the store with the preconceived design of taking the life of Withers, and

McCoy is guilty, even though he did not fire a single shot.

The court directed the jury, in plain and unmistakable language, to acquit the defendants if the deceased was the assailant; so that their attention was directly called to the vital question in the case. They have resolved this question against the accused upon testimony which fully sustains their judgment. It was their peculiar province to determine the facts, and on review their findings will not be disturbed, when it appears there is sufficient testimony to support them, or that they are not so manifestly against its weight that they were inspired by bias or prejudice, or to state a rule more nearly applicable to the case at bar, the verdict of a jury will not be disturbed when the testimony and circumstances are such that different minds might conscientiously reach different conclusions as to the facts thereby established.

The next point we shall consider is the claim of counsel for plaintiffs in error, that the court erred in directing the jury that the verdict must either be murder in the first or second degree, or not guilty. The particular objection urged is, that this instruction leaves out of consideration any charge of the crime of manslaughter. There are two reasons why this objection is not well taken. In the first place, there is not a particle of testimony which would have justified the jury in finding the defendants guilty of either grade of manslaughter. The theory of the defense was self-defense, with no attempt upon their part to justify the taking of the life of deceased except the one that, without any warning or provocation whatever, he assailed the accused Mow with a deadly weapon, and that the shots which the latter fired were for the sole purpose of preventing deceased from carrying out his murderous design upon

them.  If this were true, then they were guiltless, and should have been acquitted.  The trial judge was not required to instruct upon a question not involved in the case.—1 Bishop's Crim. Proc., § 978. In the next place, no request was made by counsel for accused for an instruction covering the crime of manslaughter.  Mere nondirection is not reversible error unless a specific instruction, good in point of law, covering the omission, was requested and refused.—*Brown v. People,* 20 Colo. 161.  If the rule were otherwise, the trial judge would practically be required to instruct on every question which the accused might have the right to have submitted to the jury, without his attention being called to questions which counsel, alive to the interests of their clients, would think of and the trial judge would not.  It would open the door for counsel to sit silently by and allow the court to commit error in failing to instruct on points which their duty to their client should prompt them to request.

Alleged error is also predicated upon the ground that the court admitted incompetent testimony.  Several photographs of the interior of the room in which the homicide occurred were offered on behalf of the people, and received in evidence, to which the defendants objected because they were not properly identified as having been taken by a skilled photographer.  The fact that a photograph was not taken by a professional does not render it inadmissible in evidence.  It is only necessary to show that a photograph, in order to warrant its admission in evidence, if otherwise competent, is a correct likeness of the objects which it purports to represent.  This may be shown by the person who made it, or by any other competent witness.—*New York S. & W. R. Co. v. Moore,* 105 Fed. 725.

Before the admission of the photographs in ques-

tion testimony was introduced by the people to the effect that they fairly represented the interior of the store on the evening of the homicide.

On behalf of the people a witness was interrogated as to whether or not either of the defendants had said anything to him about an occurrence which, it was claimed, had taken place at the home of the father of accused McCoy a night or two previous to the homicide to which he answered "No." He was then asked if any of the McCoy family had said anything about this occurrence, to which he answered "Yes," and further stated that it was Joe McCoy who spoke to him on the evening Withers was killed. These several questions were answered over the objection of the defendants. To the further question as to what was said by Joe McCoy, an objection was interposed, which was sustained. It is claimed by counsel for defendants that from the questions and answers under consideration, the jury were led to believe that some occurrence had taken place prior to the time of the shooting the details of which were kept from them, but which in their imagination may have been the cause of the attack on deceased. This is but mere surmise. We must presume that when the trial judge sustained an objection to the question which was intended to have the witness state what was said by Joe McCoy, that the jury performed their duty, and would not attempt to draw upon their imagination regarding a transaction or conversation which he held was incompetent, and which, by the ruling made, he clearly indicated was incompetent. Even if it be conceded, therefore, that permitting the witness to state that Joe McCoy had a conversation with him was erroneous, it is apparent that such error could not have prejudiced the defendants. A verdict will not be set aside for errors committed in the admission of testimony when it appears that such

testimóny did not prejudice the parties against whom it was admitted.

The judgment of the district court is affirmed.

_____ *Affirmed.*