[No. 6906.]

REAGAN v. THE PEOPLE.

1. **Criminal Law — Confessions —** No inflexible rule can be prescribed for determining the voluntary or involuntary character of an alleged confession. It must be ascertained by consideration of the circumstances under which the supposed confession was made.—(318)

That the confession was elicited by questions propounded by an officer, no threats or promises being made, or inducements held out, is not sufficient to exclude it.—(322)

It is not required that the prisoner should be warned that his voluntary statements may be used against him; though this is the better course.—(322)

Testimony given at a coroner's inquest, by a prisoner, after he has been advised of his rights, and duly cautioned, is admissible against him.—(323)

Tuttle's case, 33 Colo. 243, distinguished.—(324)

2. ——Conspiracy—Liability of Conspirators—One who engages in a conspiracy to rob, in the carrying out of which life is taken, is as guilty of the murder, even though not present, as if he had given the fatal blow; and this, even though, in entering into the conspiracy, it was not in his thought that murder would be committed.—(325)

3. ——Insanity as a Defense—Testimony that the prisoner frequently became intoxicated, there being nothing to show that

he was in that condition when he entered into the conspiracy which resulted in the murder charged, or that he was so disordered in intellect as not to. comprehend the effect of what he was doing when he confessed his part in the crime, does not call for an instruction upon the law of insanity.—(325, 326)

4. ——Instructions—Murder—Manslaughter—Where the evidence shows that the accused, if guilty at all, committed murder of the first degree, the court is not required to charge as to the law of manslaughter.—(326)

5. ——Harmless Error—A mistake of the court in describing the means by which death was produced, in an instruction defining deliberation, is harmless.—(326)

——So of an omission to charge as to the effect of exculpatory statements in a confession, where no such charge is requested.—(326)

——Or a failure to charge that circumstantial evidence is to be received with caution.—(326)

——Or to refuse to permit the prisoner to show by cross-examination of one of the people's witnesses that he had urged him to look for those directly guilty of the crime, where it appeared that he had known of the commission of the murder for some time before his interview with the witness.—(327)

*Error to Denver District Court*—Hon. Carleton M. Bliss, Judge.

Mr. J. K. P. McCallum for plaintiff in error.

Hon. John T. Barnett, attorney general, and Mr. George H. Thorne for the people.

Mr. Justice Gabbert delivered the opinion of the court:

Plaintiff in error, defendant below, was convicted of murder of the first degree. The jury fixed the penalty at imprisonment in the penitentiary, at hard labor, for life. From a sentence accordingly, the defendant has brought the case here for review on error.

In his opening statement, the district attorney detailed, in substance, the contents of signed statements of the defendant purporting to be a confession

of the part he took in the commission of the crime for which he was on trial. Counsel for defendant interposed an objection to these statements, which was overruled. Later these statements, over the objection of the defendant, were admitted in evidence. Upon these rulings of the court, two errors are assigned. The first is based upon the proposition that it is error to permit the district attorney to make statements of alleged facts, in opening the case on behalf of the prosecution, which he is precluded from proving; and second, that the confessions were inadmissible for the reason that they were not voluntary. We shall consider the second first, for the reason that, if the confessions were properly admitted in evidence, then, of course, it was not error to permit the district attorney to refer to them, or to give the substance of their contents in his opening statement to the jury.

Extrajudicial statements or confessions of one on trial for the commission of a crime must be voluntary; otherwise, they are not admissible against him. This rule is so well recognized, and the reasons therefor so well understood, that a discussion of the proposition, or citation of authorities, is not necessary. Many cases have decided the question of when statements were to be regarded as voluntary or involunary, and conclusions *pro* and *con,* reached from the circumstances under which the statement or confession was made or secured. In all cases where the question is material, the inquiry must be, Was the statement voluntary? For the purpose of ascertaining this fact, no inflexible rule can be promulgated. It must be determined from the facts and circumstances relating to how the confession was made or obtained.

In order, then, to determine the vital question involved it becomes necessary to consider the testi-

mony bearing on the circumstances under which
the defendant made the statements connecting him
with the murder for which he was convicted, pref-
aced by a brief history of the murder, and the theory
of the prosecution with respect to the part the de-
fendant took in the commission of the crime. '

John Bronk, the victim of the homicide, was an
old man who lived in a shack on the banks of Cherry
Creek, in the city of Denver. The ground in the
near vicinity of his place was used for dumping
refuse. Bronk kept a few chickens, by which means
he supported himself and accumulated some money,
which he appears to have secreted at his house or
carried on his person. The defendant was engaged
by the city to direct the dumping of refuse, and was
ordinarily stationed not far from the Bronk shack.
He became acquainted with the deceased, and fre-
quently went there at noon to eat his midday lunch,
which he carried with him. He suggested to Bronk
that improvements soon to be made would compel
him to remove his shack, and that he had better se-
cure some insurance, and then burn his place. Previ-
ous to this suggestion, the defendant had taken two
other persons into his confidence, who were to visit
Bronk, pretend to insure him by the issuance of an
insurance policy, secure the premium, divide it with
the defendant, and later, having by their visit learned
where Bronk kept his money and the amount, rob
him and divide the money thus secured with the de-
fendant. The plan was carried out, thirty dollars
being secured for an insurance policy, one-third of
which was given the defendant. Later, these two
men went to Bronk's shack and robbed him of one
hundred and fifty dollars, and, in doing so, killed
him. Fifty dollars of this money was also given
the defendant. The murder occurred on a Monday,
but was not discovered by the authorities until

Wednesday following. Shortly after the discovery, the defendant was taken to the office of the chief of police, for the reason, it was thought, in view of the fact that as he was stationed near Bronk's place, he might be able to give some clue which would lead to the detection of the guilty parties. At this interview, the defendant stated that he had been in Bronk's place as late as four p. m. of the day Bronk was murdered, and that the old man was alive at that time. A day or so later the defendant was arrested and placed in jail. He denied that he was guilty. He was kept in jail for about three days, when he was visited by his son-in-law, a police officer by the name of Wilson. According to the testimony, the statement of the defendant was secured under the following circumstances:

Chief of Police Armstrong testified that the first intimation he had that defendant had said anything about the murder was when Wilson told him that defendant said he knew the two men who committed the crime, and that the defendant wanted to see him; that he then went to the jail and said to the defendant: "If you know these people that did this job, tell us, so that we can go and get them," and that then the statement was made which was afterwards reduced to writing and signed by the defendant. This statement was brought out by interrogatories propounded by Chief of Police Armstrong, and began:

"Q.—Now, Mr. Reagan, will you give us the correctness of this thing? I want the straight facts. I don't want anything but the straight facts. A.—I will give you the straight facts.

"Q.—Now, tell me what you know about this— what there is to it. Don't keep a thing back, but tell the truth."

The witness then proceeded with his statement, and in answer to other interrogatories, gave the de-

tails of the insurance scheme, the robbery and murder, and his connection with these crimes, which conform substantially with the theory of the prosecution, as outlined to the jury, and upon which it was tried. It concludes with the following questions and answers:

"Q.—Now, this is absolutely the truth, Mr. Reagan?  A.—So help me God, it is.

"Q.—And you are willing to swear to it?  A.—Yes, sir.

"Q.—And you are making this statement of your own free will, are you not?  A.—Yes, sir.

"Q.—Now, is there anything else you can say in connection with this that you have not told me?  A.—No, sir, I do not believe there is.

"Q.—You think we have got everything pretty well?  A.—I believe we have, yes, sir."

This is one of the statements or confessions which was referred to by the district attorney in his preliminary outline to the jury, and which was afterwards admitted in evidence.

In addition to the conditions under which the foregoing statement was obtained, there is the following:  The court asked a witness, who was present when it was made:

"Q.—Were there any threats made by the defendant or any officer in the presence of and against the defendant, in case he did not state the truth concerning the matter?  A.—No, sir.

"Q.—Were there any promises made to him?  A.—There were not.  There was not even an oath. I was in the office all during the evening, and not an oath by anybody."

On cross-examination by defendant's counsel, this witness was asked: "Was there, from your observation, any pressure whatever used on Reagan

(21)

that night to wring from him any confession? A.— There was not."

So far as we are advised from the record, there is not a word of testimony contradicting the signed statement of the defendant, to the effect that he made it of his own free will. The testimony of Chief of Police Armstrong, and other witnesses, bearing on the subject of the circumstances under which the defendant made the statement, is not controverted. No threats or promises were made, nor were any inducements held out to the defendant to make the statement he did. By the officer merely stating to the defendant that he wanted nothing but the straight facts, to tell him what he knew about the matter, and not keep anything back, did not imply that the defendant was to secure any advantage if he confessed. —*State v. Kernstett,* 62 Kan. 221; *Commonwealth v. Preece,* 140 Mass. 276.

The mere fact that the confession was elicited by questions, is not sufficient to render it inadmissible. The questions were not of a character, or propounded under circumstances and in a manner either to coerce or persuade. In other words, the fact that the confession was obtained in response to questions involving no threats, intimidation, menace or inducement to the prisoner, which is the case at bar, did not render the confession inadmissible.—*Tidwell v. The State,* 40 Tex. Crim. Reps. 38.

The defendant was not warned by the chief of police that his confession might be used against him, but that is of no moment when it appears that it was voluntary. We do not understand that it is the duty of a police officer to caution a prisoner as to the consequences of making a statement which is voluntary, but merely to refrain from inducing him to make one.—12 Cyc. 463. Undoubtedly, however, the better and safer course for an officer to pursue,

when a prisoner is about to make a statement, is to warn him that it may be used against him.

Defendant was in custody at the time he made the statement, but that does not render it incompetent when it was voluntary.—*Ibid.* 466.

· Shortly after the foregoing statement was obtained, an inquest was held over the body of John Bronk. The defendant was taken before the coroner, who informed him that any statements he might make before the coroner's jury would be used in court later on, to which he replied, in substance, that he so understood it. The coroner also told him that it was not compulsory for him to testify; that he did not have to do so, and advised him that if he did, it would be used as evidence. He was also told by the coroner that they wanted to know the truth, and only the truth, because whatever he said would be taken down by a stenographer, who was present, and made a record in the case, and that he was not required to tell anything that would be against him if he did not want to; that he advised the defendant he was accused of murder, and that any statement he made could be used against him; and that the coroner then asked the defendant if he wanted to testify, and that if he did, it would be of his own free will, to which he replied he wanted to testify. Afterwards the defendant was sworn, made a statement, and, in response to interrogatories propounded, stated, substantially, the same facts that he had previously detailed in his statement to Chief of Police Armstrong. Statements made at a coroner's inquest are admissible in evidence against the person making them in a subsequent prosecution for the homicide, if they were voluntary.—*Tuttle v. People,* 33 Colo. 243.

From a consideration of what occurred prior to the time when the defendant made his statement to the coroner's jury, it is clear that what he stated at

that time was of his own free will, and that he was not induced to make it from any extraneous disturbing cause. He was told that he was accused of murder, and fully and fairly warned what consequences might follow if he chose to make any statement to the coroner's jury; so that his rights in this respect were fully protected, and he knew that he could decline to testify if he saw fit. In such circumstances we do not see how it was possible to reach any other conclusion than the one that the statement of the defendant, made to the coroner's jury, was voluntary, and that he did so with full knowledge of his rights in the premises. It seems to be settled by the great weight of authority that, where a person under arrest voluntarily testifies at a coroner's inquest, after being advised of his rights and duly cautioned, his evidence is admissible against him.

Much stress is laid upon the Tuttle case by counsel for the defendant, but it is entirely different from the one at bar. In the Tuttle case, the conclusion was reached that the statements of the defendants made to the coroner's jury were not voluntary, for the reason stated in the opinion, which was to the effect that the defendants did not feel at liberty to decline to testify because they knew that at that time they were suspected of the crime of murdering the person over whose body the inquest was being held, and for which they were afterwards tried and convicted, and to have claimed their privilege would have tended to increase suspicion against them instead of allaying it. No such conditions were present at the time the defendant testified before the coroner's jury. He had already admitted to Chief of Police Armstrong the part he took in the murder of Bronk, and to have refused to testify would not have changed his situation in the slightest degree. We are of the opinion that each of the statements he made was admis-

sible in evidence. Having reached this conclusion, it, of course, follows that the reference by the district attorney to these statements in his opening to the jury could not have been error.

The most that can be claimed for the defendant is, that probably he did not contemplate or anticipate that, in the robbery of Bronk, his life would be taken; but that does not relieve him. True, he did not take the life of the old man with his own hands, but those with whom he entered into the conspiracy to rob Bronk, in carrying out the common purpose to rob him, did; and, under our statutes, he is just as guilty as though he had struck the fatal blow.

·Complaint is made that the court should not have given an instruction on the subject of an accessory to a crime, as defined by statute, and when an accessory shall be regarded as a principal, for the reason that there was no testimony connecting the defendant with any crime therein mentioned. The objection is untenable. The theory of the prosecution was, that the defendant had entered into a conspiracy with those who actually murdered and robbed Bronk, to rob him, and that, in carrying out this common design, the life of Bronk was taken. The defendant's statements show this theory to be correct. He says he did, and admits having received from his co-conspirators his share of the money taken from Bronk. This testimony clearly called for the instruction given.

Error is assigned upon the refusal of the court to give two instructions requested by the defendant. One of them was to the effect that the term "lunatic" includes one who, by reason of intemperance or any disorder or unsoundness of mind, is incapable of managing or caring for his own estate; and the other defines the crime of manslaughter. If

the first instruction would be proper under any circumstances, it was not applicable to the facts. There was testimony tending to prove that defendant frequently became intoxicated, but it does not appear that he was in that condition when he entered into the conspiracy to rob Bronk; neither does it appear that, at this time or when he made the statements introduced in evidence, his mind was so disordered from any cause that he was unable to comprehend what he was doing. Manslaughter was not involved. The defendant was on trial for a murder committed in perpetrating a robbery. Taking human life in such circumstances was murder of the first degree, so that defendant was either guilty of that degree of homicide, or not guilty at all. It is not error to refuse instructions which are not applicable to any facts or testimony in the case.

It appears that Bronk was killed by a blow on the head with a hammer. Complaint is made that the trial judge, in one of the instructions, refers to "the fatal shot," and that the "shot was fired." These expressions with respect to means employed in taking human life were in an instruction illustrating or defining in the abstract what was meant by "deliberation," and could not possibly have misled or confused the jury. At most, it was an inadvertence, which did not prejudice the defendant.

Error is also assigned on the failure of the court to instruct the jury that, where confessions are introduced, they are to be taken together, and if they contain exculpatory or mitigating statements, the state is bound by them unless they are shown to be untrue; and also in not instructing to the effect that circumstantial evidence must always be acted on with caution. No such instructions were requested. Mere nondirection in such circumstances is not error.

The final error urged is the refusal to permit counsel, on cross-examination, to ask witness Beeds if defendant had not requested him to look for the two men directly concerned in the murder of Bronk, and if he found them to cause their arrest. It is urged that this is error, because the defendant ought to have been permitted to show that he acted at the first opportunity to have these parties answer for their crime. The exact time when defendant made such a request of the witness is not shown, but it was some time after the murder was committed. However, he cannot complain on the ground stated, because, from his own statement, he knew that Bronk was murdered before he talked with Beeds, by the two men he claims to have wanted arrested, and knew where they lived.

This disposes of all questions urged by counsel for defendant. There is no doubt but that Bronk was murdered by the two men who robbed him, and that the fatal blow was struck in the perpetration of that crime by one of these parties. The only question about which there could be any dispute was, whether defendant entered into a conspiracy with these two men to rob the old man. From his own statements he did, and he must, therefore, suffer the consequences. He may not have been present when Bronk was robbed and killed, but where a homicide is committed in carrying out a common purpose to commit a robbery, the accessory is guilty of murder.—*Noble v. People,* 23 Colo. 9.

The judgment of the district court is affirmed.

*Affirmed.*

CHIEF JUSTICE CAMPBELL and Mr. JUSTICE MUSSER concur.