[No. 7422.]

## MITSUNAGA V. THE PEOPLE.

1. JURORS—*Open Venire*—Under the statute the court may order a jury drawn from the box or summoned by an open venire. Unless prohibited by statute this power is inherent in the courts at common law.

2. CRIMINAL LAW—*Practice—Opening Statement of Prosecutor*—A narration by the prosecutor, in his opening statement, of the details of an alleged confession of the prisoner is harmless, where the confession is afterwards held competent and admitted. But it seems the better practice merely to refer to the confession, without going into details.

3. ———*Instructions Must Be Based Upon the Evidence*—In the trial of one accused of willful murder an instruction upon the law of manslaughter is properly refused where there is no evidence upon which a conviction of that degree of homicide can be rested.

4. ———*Interest of Party Testifying in His Own Behalf*—Where in the trial of an indictment the jury are told, by an instruction applying to all the witnesses, that in determining the weight to be given to their testimony they should take into consideration the motive any

witness may have to testify falsely, it is not error to say to the jury, in another part of the charge, that the accused is subject to the same test as other witnesses, and that they should take into consideration his interest in the result of the trial.

5. EVIDENCE—*Cross-examination*—It is not admissible to interrogate a witness on cross-examination as to matters not germane to his testimony in chief, and having no reference to statements attributed unto him at variance with his testimony.

6. ——*Discrediting Witness—Prior Statements*, of a witness about matters upon which he has not given testimony are not to be shown; nor statements touching collateral irrelevant, or immaterial matters, which have no tendency to affect his credibility or test his recollection.

7. ——*Confessions—Privileged*—A statement made by an accused person to an officer, in the presence and through the aid of a clergyman, is not to be excluded on suggestion of the ecclesiastical character of such clergyman, where it does not appear that the clergyman was the spiritual adviser of the accused, or even that they were of the same sect, or denomination.

8. ——*Prosecution Not Bound by*—The prosecution are not bound by the statements made by the prisoner, even though produced in chief against him, and though they are not contradicted. It is for the jury to say how far the statement is to be accepted.

9. WRIT OF ERROR—*Harmless Error*—To admit evidence of a confession or statement of the accused is not injurious, where testifying on his own behalf, he makes substantially the same statement.

So where, the prisoner being charged with murder, his counsel called upon the prosecutor to produce certain clothing of defendant, in order to show that it bore no blood-stains. It did not appear that the prisoner wore the clothes in question while at the scene of the homicide, and the chief of police, to whom they had been delivered, testified that they showed no blood-stains. *Held*, that the failure to require their production was harmless.

Error to Denver District Court.—Hon. HUBERT L. SHATTUCK, Judge.

Mr. O. N. HILTON, Mr. B. B. LASKA and Mr. CAESAR. A. ROBERTS, for plaintiff in error.

Hon. BENJAMIN GRIFFITH, attorney general, Mr. PHILIP W. MOTHERSILL, assistant attorney general, for the people.

Mr. Justice Garrigues delivered the opinion of the court:

1. Friday, May 6, 1910, Catherine Wilson moved into No. 1054 Clayton street, Denver. The family consisted of herself and husband; but she was alone at the time, he being at Hot Springs, Arkansas. That night, she stayed with her daughter, Mrs. Galland, and Saturday, returned to the house, where she employed the defendant to clean the windows and bath tub, in the afternoon. Saturday afternoon, she met Hazel Miller, whom she invited to stay with her that night, and as far as disclosed by any of the evidence—other than the account given by the defendant—this is the last that was seen or heard of her, until her body was found Monday afternoon. Miss Miller on arriving at the house Saturday evening to keep her engagement, found the house locked. She went in by raising a back window; but found no one there, and after waiting for Mrs. Wilson an hour or more, left about 8:30. Sunday, May 8, Mr. Wilson, who was on his way to Denver from Hot Springs, telegraphed his wife, in care of Mrs. Galland, that he would arrive in Denver about 12:15 Monday noon. Late in the afternoon, Mr. Galland took this message to 1054 Clayton street, and finding the house locked, and no one at home, left it sticking in the door. Miss Miller told Mrs. Galland of her experience at the Wilson house Saturday night, and Mrs. Galland, still unable to learn of the whereabouts of her mother, met Mr. Wilson at the station, and told him she was missing They went to the house that afternoon, finding it still locked, and upon searching the premises, found the body in the cellar, crowded into a box, covered with excelsior, straw, and another box. A strip of muslin cloth was drawn tightly about the throat, indicating strangulation. There were bruises and cuts on the head and chest, and blood stains in the kitchen and on the stairs leading to the cellar, an attempt having been made to obliterate these by wiping them up with rags, left in the sink. Her "rat" had been crowded into her throat, and a

three-pound Indian club stained with blood, was found behind the retaining wall in the cellar.

Deceased was a large, robust woman weighing about 160 pounds. The defendant was a small Japanese, about 120 pounds in weight, but physically strong and active, except that his left arm had been injured ten years before. He worked for a Broadway cleaning establishment, operated by a Japanese, who took orders, and filled them by sending others to do the work, collecting a percentage on what they received, as commission.

On this Saturday morning, defendant was sent to clean carpets on York street, and while there, was directed by phone from the establishment, to go to 1054 Clayton, to work in the afternoon, which he did, arriving there about 1:30, and going to work at once. He left about 5:30, before finishing, going to the cleaning house, where he ate his supper, changed his clothes, went down town, returned, and erased his name from a book which gave the information that he had been sent to 1054 Clayton. That night he went to McCook, Nebraska, changed his name, and in a couple of days, went to work as a section hand. Later he was arrested there, brought to Denver, and placed in jail. While confined, he made two separate statements to the authorities regarding the transaction, which were reduced to writing, and on the trial, were read to the jury as part of the people's case in chief. In the first statement, he said he had not worked at all, at 1054 Clayton, that he went there; but that the lady who came to the door, told him she wanted a Jap to come in the morning, and not in the afternoon, so he returned to the cleaning establishment. In the second statement, he said he worked at 1054 Clayton, cleaning the windows in the afternoon, and assisted a man in putting the dead body of Mrs. Wilson in the box. In the first statement, he said he went on the train with 12 Jap boys to McCook. In the second, he said he did not know whether they were on the train; that he met them after he arrived there. In the first statement, he said he borrowed the money

to buy a ticket to McCook; in the second statement he said he
bought it with money given him by the man he assisted. On
the trial, he said that he was sent by the cleaning establishment
to 1054 Clayton, where he made an agreement with the lady
to clean her windows and bath tub, and went to work at once;
that he cleaned the windows first, and then went to the bath
room, the lady being about the house, and occasionally con-
versing with him; that while he was working in the bath room,
a tall stranger came in, his face scratched and bleeding, and
his shirt covered with blood, who, with a revolver in his right
hand, seized defendant with his left, and forced him to go
to the cellar, where, at the bottom of the stairs, lay the dead
body of the lady; that the man's left arm was injured, and he
put a cloth around her neck, stood on one end of it and pulled
the other end with his right hand until it was tight, then at
the point of his revolver, he forced defendant to assist him in
putting the body in the box; that the stranger, still threatening
him with his revolver, forced him to take rags and wipe up
the blood stains, after which, he took him to the front door,
gave him $30.00, and pushed him out. Going to the cleaning
establishment, he changed his clothes, ate supper, and went
down town, where he met a fellow countryman, to whom he
related the occurrence, and being informed that it was a seri-
ous matter, he became frightened, went back and erased his
name from the book showing his presence at 1054 Clayton,
not on account of the transaction; but to escape the payment
of a commission; then went down town again and tried to
secure a railroad pass to accompany a number of Japanese
boys who were going to McCook, Nebraska, to work on the
section; but failing in this, he bought a ticket with a portion
of the money the man had given him, and left that night.

The defense is, that the murder was committed by the
stranger who compelled defendant to assist him in putting the
body in the box, and wipe up the blood stains; and an attempt
is made to cast suspicion upon Mr. Wilson. There is no evi-
dence in the whole record even suggesting the husband had

anything to do with the crime. No objection is made here that the evidence is not sufficient to support the verdict. The errors assigned are: 1. Challenge to the array; 2. Election between counts; 3. Remarks of the district attorney in opening the case; 4. Refusal to allow certain cross-examination; 5. Admission of defendant's statements; 6. Failure of the chief of police to produce certain clothes. Such of these assignments as have not been abandoned, will be considered.

2. Defendant challenged the array because the jurors were selected upon an open venire, and not drawn, at a time when there were in the box the names of 500 competent jurors. There is nothing in this contention. The statute provides that the court may order a jury drawn from the box, or summoned by an open venire. Whenever the court needs more jurors, it has the power, under the statute, to either draw them from the box or summon them by an open venire. Aside from this, we have held that the statutory method of summoning jurors is not exclusive, and unless prohibited, the court has the inherent common law power to select a jury upon an open venire, directed to the sheriff.—*Mackey v. People,* 2 Colo. 13; *Giano v. People,* 30 Colo. 26; *Imboden v. People,* 40 Colo. 142; *Walt v. People,* 46 Colo. 138.

3. It is next complained that the district attorney in his opening statement, told the jury that the defendant had confessed, and narrated the purported confessions—being the two statements afterwards admitted in evidence—to the jury. It is contended the court should not have allowed the prosecution to do this, because the admissibility of the evidence had not been determined, and if excluded, the rights of the defendant might be jeopardized. It probably would be the better practice, ordinarily, for the prosecution in opening, merely to refer to such matters, without going into details; because at the trial, the offered evidence might be excluded. In this case, however, no harm was done the defendant, because the statements were afterwards held competent, and admitted in evidence.

4.   Deceased's husband, Ridgley Wilson, testified about starting to Denver from Hot Springs, and telegraphing his wife from Kansas City that he had missed connections, and would not reach Denver until 12:15 Monday noon; of Mrs. Galland meeting him at the station and telling him of the disappearance of his wife; of their going to the house in the afternoon and finding the body in the cellar. This, in substance, was his testimony. On cross-eyamination he was asked : Did your wife tell you, just before you left Denver, that she had told Mrs. Faxon, that she desired to change her insurance policy, so as to make her daughter beneficiary instead of yourself; that she expected something would happen to her; and that if she was killed, it would be you who did it, to look for her and she would be found? Did you ever pursue her with a revolver, about the house? You had frequent quarrels with your wife, while you were married and living with her? Did you tell her in a letter, that when she found a house, you wanted her to get one in a locality where you were not known? Did you tell Mabel Galland, you wanted her to keep it, (the identification slip given him by the porter on the Pullman) that somebody might say you had come into Denver on a mule? The objections to these questions were sustained, because they were not proper on cross-examination. It is claimed in argument, they were asked for the purpose of impeaching the witness. It is evident they were not germain to any matter about which the witness had testified, and therefore, not proper cross-examination; neither were they proper impeaching questions. If a witness has made previous statements out of court, upon a matter material to the issue, substantially different from his evidence in court, such statements may tend to impeach his recollection or his truthfulness, and should be considered by the jury in determining the credibility of the witness, and the weight to be given to his testimony.—*Rose v. Otis,* 18 Colo. 59; *Mullen v. McKim,* 22 Colo. 468; *Jaynes v. People,* 44 Colo. 541; *Ryan v. People,* 21 Colo. 119; *Nutter v. O'Donnell,* 6 Colo. 253.

But prior statements of a witness about matters upon which he has not testified in court, cannot be shown. There must be a material inconsistency or contradiction between his evidence in court, and his alleged previous statements out of court, and the impeaching question must not be upon collateral, irrelevant or immaterial matters; but must be upon matters material to the issue. The test as to its materiality is said to be: If the statement which it is alleged the witness made out of court, was true, would the impeaching party be entitled to prove it in support of his case?—*Askew v. People,* 23 Colo. 455; 40 Cyc. 2700.

These questions did not tend to affect the credibility, or test the recollection of the witness upon any material evidence he had given, and if he had answered in the negative, defendant would not, on that account, have been allowed to prove the contrary.

5. While in jail, defendant was visited by Shirato, a Japanese Methodist minister, who reported to the chief of police, that defendant wished to see him. He was taken to the chief, and made the first statement. Later, he again sent word by Shirato that he wanted to see the chief, to whom he made the second statement. It is claimed these statements were privileged communications, because made to Shirato as his spiritual adviser. There is no evidence that defendant was a Methodist, or that Shirato was his spiritual adviser. Defendant voluntarily sent his wish by Shirato to see the chief, and then made the statements to him. He was well represented by interpreters, and precaution was taken to remind him of the seriousness of the offense, and that his statement must be voluntary. No violence, threats, inducements, promises or hope of any kind were held out to him to induce him to make these statements, and there was no error in admitting them in evidence.—*Reagan v. People,* 49 Colo. 316; *Byram v. People,* 49 Colo. 533. The defendant afterwards testified in his own behalf in practically the identical language of his second state-

ment, so we do not see how he could have been harmed by its introduction in evidence by the people.

6. It will be remembered the defendant, after he left Clayton street, went to the cleaning establishment, ate his supper, changed his clothes, and went down town. Afterwards, the proprietor of the place, delivered some clothes to the chief of police, which were said to belong to defendant, and on the trial the officer was subpoenaed *duces tecum,* by the defendant, to produce these articles; the purpose being to show the jury they contained no blood stains. This the chief said he could not do, because they had disappeared, and this is assigned as error. There is no evidence that these clothes were worn by the defendant while at the Wilson house; and as the chief testified the clothes brought to him showed no signs of any blood stains, their non-production could make no difference to the defendant.

7. Error is assigned upon the refusal of the court to instruct upon manslaughter. The deceased was murdered. Over this, there was no controversy. Who committed the murder, was the only question. There was no occasion for instructing on manslaughter, because there was no evidence upon which to base such a verdict.—*Smith. v. People,* 1 Colo. 144; *Crawford v. People,* 12 Colo. 292; *Kelly v. People,* 17 Colo. 137; *Carpenter v. People,* 31 Colo. 290; *Mow v. People,* 31 Colo. 360; *Van Wyk v. People,* 45 Colo. 12-18; *Reagan v. People,* 49 Colo. 326.

8. In instruction 16, the court told the jury they were the judges of the credibility of all the witnesses and the weight to be given their testimony; in determining which, they should take into consideration the motive or interest any witness might have in testifying falsely. In instruction 17, they were told that defendant was subject to the same test as other witnesses, and they should take into consideration his interest in the result of the trial. Error is assigned upon the latter instruction, because it singles out the defendant, and directs special attention to his credibility. The court had previously

told the jury in instruction 16, that they were the judges of the credibility of all the witnesses, and should take into consideration the interest any witness had in the trial. This included the defendant as a witness, and the court might properly have stopped there; but perhaps some juryman might not have comprehended that this included him, that is, might have considered him in some different or other capacity; therefore, it was not prejudicial error for the court to tell the jury in another instruction, that the defendant was a witness, and they had no right to disregard his testimony merely because he was the defendant; but must consider it, and give it such weight as they thought proper, in connection with all the other evidence in the case, and in determining the weight and credibility of his evidence, they had a right to take into consideration the fact that he was the defendant, and his interest in the result of the trial. We know there are authorities holding it is reversible error to single out the defendant in this manner; but we fail to see how such an instruction can so prejudice the rights of the defendant as to make it reversible error, and this court is committed to its propriety.—*Minich v. People,* 8 Colo. 440-453; *Babcock v. People,* 13 Colo. 515-523; *Porter v. People,* 31 Colo. 508-515.

9.   Counsel for defendant contend the people were bound by his statements which the prosecution introduced in evidence in chief, unless they were shown to be untrue. It was for the jury to determine from all the evidence in the case, how much, if any of the statements they would believe.—*State v. Merkle,* 189 Mo. 315-321.

*Affirmed.*

Mr. JUSTICE WHITE and Mr. JUSTICE MUSSER concur.