## FRANCES TAYLOR v. STATE.

No. A-4286. Opinion Filed April 28, 1924.
Rehearing Denied May 24, 1924.
(225 Pac. 988.)

(Syllabus.)

1. **Homicide—Indictment for Murder Held Sufficient—When Indictment Sufficient Stated.** The indictment examined, and found sufficient to apprise the accused of the nature of the accusation she was required to meet; the indictment charged murder without authority of law, with a premeditated design to effect death.

   (a) The averments will be held sufficient where the offense is stated with clarity, according to the common acceptation of the language used.

2. **Courts—Discretion to Transfer Cause from One Division to Another.** Where there is no direct authority found in the act creating a court for transferring a cause from one of the places of holding court to another, the court has an inherent right, in his discretion, upon a proper showing to transfer a cause from one division of the court to another division of the same court.

3. **Continuance—Refusal of Continuance to Permit Witness to Attend Sick Father not Abuse of Discretion.** Where a witness then present in court desired to be in attendance at the bedside of his father, who was seriously ill, the court did not abuse his discretion in refusing an application for a continuance on that ground, since the witness might then have been examined, out of turn, on order of the court, had an application of that kind been made or suggested.

4. **Trial—Introduction of Witness out of Order Held not Error.** Where it appeared that the state had used all of its witnesses except one who was sick and not in attendance on the trial, but who could be present the next day, the court committed no error in permitting the state to introduce this witness out of order after the state had rested its case in chief, with the understanding at the time that this witness would be introduced in chief later.

5.    **Evidence—Confession not Inadmissible Because Made Under Excitement.** A confession should not be rejected merely because it was made under great excitement or mental distress, or fear, where such state of mind was not produced by extraneous pressure exerted for the purpose of forcing a confession, but springs from apprehension due to the situation in which the accused finds herself.

6.    **Same—Confessions by Persons Said to be Mentally Deranged not Inadmissible.** Generally, confessions made by persons said to be mentally deranged are not, for that reason, inadmissible, but the circumstances under which it was made are to be taken into consideration by the jury in determining the weight and credibility thereof.

7.    **Same—One Desiring to Confess Should be Warned.** It is better practice for peace officers and county attorneys to warn a person who desires to make an extrajudicial confession, in the absence of friends and counsel, that whatever statements he may make may be used against him at the trial. However, not every confession made without such precaution will be excluded.

8.    **Judgment and Sentence—Where Jury to Inquire into Sanity of Convicted Defendant Unnecessary.** Under the circumstances pointed out in the opinion, where the court, after due caution and examination, is of the opinion that a convicted defendant, about to be sentenced, is then of sound mind, it is unnecessary to call a jury to inquire into her sanity.

Appeal from Superior Court, Creek County; Gaylord R. Wilcox, Judge.

Frances Taylor was convicted of murder, and she appeals. Affirmed.

See, also, 20 Okla. Cr. 130, 201 Pac. 1119.

Walter Mathews, for plaintiff in error.

The Attorney General and J. Roy Orr, Asst. Atty. Gen., for the State.

BESSEY, J. Plaintiff in error, Frances Taylor, in this opinion referred to as the defendant, was, by indictment filed in the superior court of Creek county, charged with the mur-

der of Tennessee Watson. At the trial, November 23, 1921, she was found guilty as charged, and her punishment fixed at life imprisonment in the state penitentiary.

Tennessee Watson was living with her husband and baby on a farm near Oilton, near the farm and home of the defendant. Defendant owned her farm, and had working for her a man named Harrison Lee; she had been twice divorced and was living with Lee, although not married to him, at the time of the homicide. Willie Graham lived on another farm in the same neighborhood. All of the parties were colored, Willie Graham being a Creek freedman.

The testimony shows that on the morning of the homicide Hartman Watson, the husband of the deceased, left home, in company with his brother, and did not return home until late that night; that he left a loaded single-barreled shotgun hanging on his kitchen wall; that when he returned home he found the body of his dead wife lying on the floor, and found that she had been shot with this shotgun.

Willie Graham was arrested for the crime, and confessed to having shot deceased. He was given a life sentence for the crime. Willie Graham says that Frances Taylor, the defendant, had talked to him on a number of occasions, and tried to get him to kill Tennessee Watson for her; that she finally offered to pay him $1,000 for the job and agreed to pay him $50 of that amount cash, when he had killed the Watson woman. He stated that on the morning of the homicide he went to Frances Taylor's home, and that she gave him a pint of whisky; that he drank most of it and got pretty drunk; that he went to the Watson home and shot Tennessee Watson, but that he was so drunk that he didn't remember how he got away from the scene of the killing, but that within a short time afterwards he went to Frances Taylor's house, where she paid him $11, a $10 bill and a $1 bill, and

agreed to get the balance of the $50 for him the next day; that the next morning they had some conversation at Frances Taylor's house, out near her hogpen, and that she wanted to give him a hog as part payment of what she owed him, but that he refused to take the hog. He stated that in the afternoon, immediately following the homicide, when he had gone to Frances Taylor's house, that Harrison Lee was there, and that he saw him; he stated further that at the holding of the inquest when they began to talk about getting bloodhounds, he and the defendant left, and would not contribute anything toward the fund that was being raised for that purpose; that defendant told him to put pepper in his tracks.

Graham's confession was corroborated by these circumstances: Hartman Watson, husband of the deceased, testified that Frances Taylor had talked to him, prior to the homicide, and had told him that his wife, Tennessee Watson, had been running over her, and that if she ever crossed her trail again "why, she was her meat." Not long before the homicide, Hartman Watson and his wife went down to Frances Taylor's house, and while there Frances and the Watsons engaged in a violent dispute. At that time Frances was armed with a pistol, which she held in her hand during the conversation. Harrison Lee, the man who was living with defendant, testified that he and defendant were sweethearts; that he had been living with her for about eight months; that defendant was jealous of his friendship with deceased, and that defendant had told him that she thought the Watson woman was trying to get him to quit staying with her; that she had told him about it two or three times, the last time possibly a week before the killing; that although defendant was jealous of him, he had never had any improper relations with the deceased woman. He stated that he was present when Graham came to defendant's house the afternoon of the killing.

In some particulars the confession of Willie Graham was corroborated by the testimony of three neighbors, and by Oneeta Watson, and a deputy sheriff.

The first assignment of error urged in the brief is that the indictment does not charge this defendant with murder, in that it does not specifically state the homicidal act was committed by Frances Taylor, "with a premeditated design to effect the death of Tennessee Watson."

The portion of the indictment setting out the charge is as follows:

"Said defendants, then and there being, did then and there willfully, unlawfully, and feloniously, without authority of law, make an assault upon one Tennessee Watson; that the said Willie Graham, then and there being, armed with, and holding in his hands, a certain dangerous and deadly weapon, to wit, a shotgun, loaded and charged with gunpowder and leaden bullets, did then and there willfully, unlawfully, feloniously, and without authority of law, and with the premeditated design of him, the said Willie Graham, to effect the death of the said Tennessee Watson, make an assault upon the said Tennessee Watson with the said shotgun, so loaded and charged; that the said Willie Graham then and there willfully, unlawfully, feloniously, and without authority of law, intentionally, and with the premeditated design then and there of him, the said Willie Graham, to effect the death of her, the said Tennessee Watson, did then and there discharge, shoot off, at, towards, against, and into the body of her, the said Tennessee Watson, one of the leaden bullets aforesaid, then and there striking the body of the said Tennessee Watson, then and there, and thereby inflicting upon the body of the said Tennessee Watson one mortal wound, of which mortal wound she, the said Tennessee Watson, then and there did die; and the said Fannie Taylor, then and there being, did then and there willfully, unlawfully, feloniously, without authority of law and with a design to effect the death of the

said Tennessee Watson, in the manner and form aforesaid, aid, help, abet, comfort, assist, maintain, advise and encourage the said Willie Graham to kill and murder the said Tennessee Watson; and, in the manner and form aforesaid, willfully, unlawfully, feloniously, and premeditatedly kill and murder the said Tennessee Watson, as aforesaid."

It will be seen that the indictment charged that the defendant conspired with Willie Graham to commit the crime, and that she aided and abetted him in its commission, and that she did so "with a design to effect the death of Tennessee Watson, in the manner and form aforesaid."

A design to effect death is inferred from the killing unless the circumstances raise a reasonable doubt whether such design existed. Section 1734, Compiled Statutes 1921.

Words used in a statute to define a public offense need not be strictly pursued in an indictment, but other words conveying the same meaning may be used. Section 2562, Compiled Statutes 1921. And the words used must be construed according to their usually accepted meaning. Section 2561, Id.

By this test it appears that the indictment sufficiently apprised the defendant of the nature of the accusation she was required to meet, and that the indictment charged murder without authority of law, and with a premeditated design to effect the death of Tennessee Watson. No indictment is insufficient by reason of any defect or imperfection in the matter of form which does not tend to the prejudice of the substantial rights of the accused.

Counsel for defendant says, in support of this assignment of error, that his contention is sustained by the holdings of the court in Jewell v. Territory, 4 Okla. 53, 43 Pac. 1075, and the case of Holt v. Territory, 4 Okla. 76, 43 Pac. 1083. In the Jewell Case the averment was that the act was

committed "with malice aforethought." It was held insufficient because the term "with malice aforethought" did not necessarily mean that the homicidal act was done with premeditation. In the Holt Case the charge was that the act was done "willfully, unlawfully, purposely, * * * and of his deliberate and premeditated malice." This was held not to necessarily mean that the act was done with a premeditated design to effect death.

The statutes covering our criminal procedure have eliminated many of the technical methods of stating an offense and the averments will be held sufficient where the offense is stated with clarity, according to the common acceptation of the language used, in such a way as will apprise the accused of the nature and import of the charge against him. Walcher v. Territory, 18 Okla. 528, 90 Pac. 887; Turner v. State, 8 Okla. Cr. 11, 126 Pac. 152.

It is next urged that the court was without jurisdiction to try the defendant at Drumright. The act creating the superior court of Creek county, chapter 138, Session Laws 1917, provided for terms of court at Sapulpa, the county seat, and at Drumright. The indictment in this case was found by grand jury at Sapulpa. The county attorney made application to the court to remove the cause to Drumright for trial, for the reason that Drumright was more convenient for the witnesses, and nearer the place where the crime was committed than was Sapulpa. The defendant made no objection to this transfer from Sapulpa to Drumright, at the time, but now complains that the court was without jurisdiction to try the cause at the latter place. She also complains that after the trial at Drumright the court deferred pronouncing sentence, and fixed the time and place of pronouncing judgment at Sapulpa.

While there is no direct authority found in the act creating this court for transferring a cause from one of the places of holding court to the other, it seems that the court would have an inherent right, in his discretion, upon a proper showing, to transfer a cause from one division of the court to another division of the same court. In the case of Rosencrans v. United States, 165 U. S. 257, 17 Sup. Ct. 308, 41 L. Ed. 708, involving the question of the territorial jurisdiction of the Circuit Court of the United States in a criminal case, the Supreme Court, speaking through Mr. Justice Brewer, who delivered the opinion, said:

''No mere multiplication of places at which courts are to be held, or mere creation of divisions, nullifies it. Indeed, the place of trial has no necessary connection with the matter of territorial jurisdiction. * * * So far as the mere transfer of the place of trial from one division to another, it would seem, in the absence of express prohibition, to be within the competency of the court having full jurisdiction over the entire district, and certainly presents no ground of error when it is not at the time challenged, and the trial proceeds without objection.'' People v. Warden of the City Prison, 117 App. Div. 154, 102 N. Y. Supp. 374.

The defendant next contends that the court erred in overruling his motion for a continuance because a witness then present in court desired to be in attendance at the bedside of his father, who was seriously ill. Under all the circumstances here the court did not abuse his discretion in refusing this application. The witness was in court, and might then have been examined, out of order, on order of the court, if an application of that kind had been made or suggested.

Defendant says next that the court erred in permitting the state to rest its case in chief, with a reservation of the right to introduce a witness, J. B. Andrews, later on. It appears that the state had used all its witnesses except Andrews,

who was sick and not in attendance on the trial, but who could be present the next day. The next morning he appeared in court, and was permitted to testify relative to an alleged confession made by the defendant. This, it seems, was within the discretion of the court. Section 2687, Comp. Stats. 1921, provides that the "parties may then, respectively, offer rebutting testimony only, unless the court for good reason, in furtherance of justice, or to correct an evident oversight, permit them to offer evidence upon their original case." This statute, as well as sound reason, indicates that the order of the admission of testimony rests in the sound discretion of the trial court. Harvey v. Territory, 11 Okla. 156, 65 Pac. 837.

The next assignment of error, and one upon which defendant's counsel places much emphasis, is with reference to a confession of defendant made to a deputy sheriff. The claim is made that at the time this confession was made, the defendant was insane, and that the confession was involuntary, and made under the stress of fear and excitement; that she was afraid that a mob was coming to take her from the jail; that she was at the time mentally incapable of making any statement entitled to credence; and that the court erred in admitting this confession for any purpose whatever. Upon this feature of the case, the testimony of the deputy sheriff, J. B. Andrews, is as follows:

"Q. How did you come to have a conversation with her? A. Well, Mr. Fox, the jailer, was inside doing something, and I was standing in the door, and this defendant, Frances Taylor, was in the jail in the cell, and she saw me standing in the jail, and she called me over and wanted to talk to me.

"Q. Did she call you? A. Yes, sir.

"Q. Did she seem to be rational? A. She seemed to be.

"Q. Did she talk to you? A. Yes, sir.

"Q. Did you lead her out, or did she say what she did, voluntarily, to you? A. Well, I will give you a part of the conversation so you may judge correctly. I said, 'Frances, what do you want, what is the matter with you, what have you done you want to talk to some one?' 'Well,' she says, 'What are you going to do with me?' and I says, 'I don't know what they are going to do with you. I don't know that anybody is going to hurt you.' I said, 'You have done something you want to talk to somebody all the time;' and I said, 'What have you done?' 'Well,' she says, 'I told Jody to go down there and kill that woman, and I would give him $50.' And I said, 'What woman?' and she said, 'Tennessee Watson.'

"Q. Did she talk heartily to you? A. Yes, sir.

"Q. In a rational manner? A. Yes, sir.

"Q. Intelligent manner? A. Very intelligent; yes, sir.

"Q. Did you use any persuasion, or promise, or duress? A. No, sir.

"Q. You did not prompt her? A. No, sir.

"Q. You did not ask her to say anything to you? Did not ask her for the confession? A. No, sir."

Defendant's attorney testified that on the day following defendant made some wild statements about a blanket she had, being a pretty dress, and about God painting some pictures on the wall of the jail, and other remarks that would lead one to believe that she was not in her right mind; that she told him that her babies were going to be scalded, and that her lover, Lee, was dead, and that she made a lot of other wild remarks calculated to make one doubt her sanity. An undersheriff testified that the mental condition of defendant had been all right up until the time her attorney talked to her, some time Monday evening.

Upon this issue the defendant requested the following instruction, which was by the court refused:

"You are instructed that before you should consider any confession or admission made by the defendant, Frances Taylor, for any purpose, you should ascertain whether it was voluntarily made by her. In this connection the court instructed you that if, at the time she made the confession or admission, if you find that she did make such confession or admission testified to, she was not conscious of what she was saying or was in fear of bodily injury to herself or members of her immediate family, though her belief that she would receive such injury was wholly unfounded, or so mentally deranged as not to know or understand what she was saying, or the nature and consequences of her statements, you should not consider such confession, for any purpose, in arriving at a verdict in this case."

The court, in lieu of the instruction requested, gave the following:

"You are instructed that oral statements made by the defendant, as testified to and offered as evidence in this case, tending to show the confession of the defendant, that such verbal admissions, consisting of mere oral statements by the defendant, are termed 'extrajudicial confessions,' and that such confessions are those made by the party elsewhere than before the magistrate or in court, and that such verbal admissions may be subject to much imperfection and mistake, for the reason that the defendant may not have expressed her exact meaning, or that the witness may have misunderstood the exact language used; but you are the exclusive judges of the weight and credence to be given to such evidence in this case.

"But if you find that the defendant did make any admissions or statements at any time, you will consider these things, together with her knowledge of the English language, and her power to express herself clearly, her illness or sickness, if any, at the time, and her general intelligence. If the admissions were freely, voluntarily, without fear, hope

of reward, understandingly, and deliberately made, and clearly proved, the jury may, in their discretion and are at liberty to give them such weight and credence in their deliberations.''

The rule generally adopted in regard to admissions or confessions made by persons said to be mentally deranged is that the admissibility or voluntary character of the confession is not affected thereby, but the circumstances are to be taken into consideration by the jury in weighing the evidence. A confession under such circumstances should not be rejected merely because it was made under great excitement or mental distress, or fear, where such state of mind was not produced by extraneous pressure exerted for the purpose of forcing a confession, but springs from apprehension due to the situation in which the accused finds herself. 1 R. C. L. 562; Cases and Annotations, 18 L. R. A. (N. S.) 788-790; State v. Berberick, 38 Mont. 423, 100 Pac. 209, 16 Ann. Cas. 1077.

The testimony of the attorneys for defendant, to the effect that the defendant was for some time in such a state of mind that they could not intelligently converse with her, and that, in their opinion, she was wholly irresponsible, related to her mental condition not at the exact time she made the confession, but at a time beginning the day following, and on subsequent days. We hold therefore, that, under the rule above announced, the court committed no error in refusing to give the instruction requested, or any other instruction to the effect that the jury should not consider the confession for any purpose whatever; and that the instruction given was proper under all the circumstances in the case. If the testimony had showed that at the time the confession was made the confessor was insane or without understanding, the rule announced in Grayson v. State, 40 Tex. Cr. R. 573, 51 S. W. 246, and the case of State v. Mason, 4 Idaho, 543,

43 Pac. 63, would apply. Our own court, in the case of Berry v. State, 4 Okla. Cr. 202, 111 Pac. 676, 31 L. R. A. (N. S.) 849, held:

"The admissibility of a confession, where it is challenged, is a question solely for the court, after hearing, in the absence of the jury, all the evidence on each side respecting the circumstances under which the confession was made; and the court is vested with a large discretion in determining the matter.

"After a confession has been admitted, the defendant is entitled to have the evidence, in regard to the circumstances under which it was made, given anew to the jury, not that the jury may pass upon its competency or admissibility, but for the purpose of enabling them to judge what weight and value should be given to it as evidence; and, upon his request, the defendant is entitled to an instruction on that point."

The rule of practice, so announced, was followed exactly in this case. The record discloses that no force or coercion was used to obtain the confession. The confession was therefore voluntary, and was proper for the consideration of the jury for whatever it might be worth. The fact that the defendant may have been excited or in fear of mob violence, or fearful for the safety of her children, did not affect the admissibility of the confession, but was proper for the consideration of the jury as affecting its weight and credibility, as outlined by the court in the instructions.

It is better practice for peace officers and county attorneys to warn a person who desires to make an extrajudicial confession, in the absence of friends and counsel, that whatever statements may be made might be used against the accused at the trial. This and other courts have often denounced what is commonly known as "third degree" procedure. However, not every confession made without such

precaution will be excluded. In this case there was no attempt to force or coerce, or to obtain the confession by means of any trick or deception—a situation quite different from that in the case of Miller v. State, 13 Okla. Cr. 176, 163 Pac. 131, L. R. A. 1917D, 383, wherein Judge Doyle denounced third degree methods. Officers should warn a prisoner before listening to confessions, but we think it would be going too far for the court to say that, to make a confession admissible, the officer must warn the prisoner. In the case of Reagan v. People, 49 Colo. 316, 112 Pac. 785, the court said:

"It is not the duty of a police officer to caution a prisoner as to the consequences of making a statement, which is voluntary, but merely to refrain from inducing him to make one; though the better course is to warn the prisoner that the statement may be used against him."

The same rule has been announced by the Supreme Court of the United States in Bram v. U. S., 168 U. S. 532, 18 Sup. Ct. 183, 42 L. Ed. 568.

The order made at Drumright, deferring sentence, was as follows:

"Court refuses to pass sentence on defendant at this time on account of her evident mental unsoundness and disability. Judgment hereby suspended until further order. Defendant, Frances Taylor, to be taken to Sapulpa for observance in the county jail."

On December 17th, at Sapulpa, defendant was brought into court, and an examination had as to her sanity, covering several pages of the record, in which the court made inquiry of the county attorney, the jailer, and the doctor, as to her mental condition, and then pronounced sentence, in accordance with the verdict previously rendered.

Section 2769, Comp. Stats. 1921, is as follows:

"Defendant may show cause against judgment: * * *

"First, that he is insane; and if, in the opinion of the court, there is reasonable ground for believing him to be insane, the question of his insanity must be tried as hereinafter in this chapter provided for. If, upon the trial of that question, the jury find that he is sane, judgment must be pronounced, but if they find him insane, he may be committed to one of the state lunatic asylums until he becomes sane, or be otherwise committed, according to law; and when notice is given of that fact, as hereinafter provided, he must be brought before the court for judgment."

We deduce from the record that the court was of the opinion, and found, upon this examination, that on December 17, 1921, there was no reasonable ground for believing defendant insane, and held accordingly; and that it was therefore unnecessary to call a jury to pass upon her sanity, pursuant to the terms of this statute.

The situation here was not such as was disclosed in the case of Marshall v. Territory, 2 Okla. Cr. 136, 101 Pac. 139. In that case the court took testimony regarding the sanity of the defendant from several witnesses, including the county clerk, Thomas H. Doyle, counsel for the defendant, and several doctors, all of whom were of the opinion that the defendant was insane. The court, disregarding all this testimony, refused a jury trial to inquire into the sanity of the defendant. Special Judge Fulton of this court held that it was reversible error. The statutes at that time, moreover, were different from the statute above quoted, and the facts and circumstances of the case were different.

We hold that the evidence in this case was sufficient to support the verdict; the instructions of the court, separately and as a whole, were fair to the defendant; and we find no irregularity in the trial sufficient to disturb the verdict. The judgment of the trial court is therefore affirmed.

MATSON, P. J., and DOYLE, J., concur.