## LEROY BENTON v. STATE.

No. A-10742.  Feb. 18, 1948.
(190 P. 2d 168.)

138

Amos T. Hall, of Tulsa (B. C. Franklin, of Tulsa, of counsel), for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, J.   Defendant, Leroy Benton, a Negro, was charged by information with the murder of Panta Lou Liles, in Tulsa county, Oklahoma, on March 15, 1945. The information alleged that said murder was effected by means of a certain heavy, blunt instrument with which the defendant allegedly inflicted certain wounds about Panda Lou Liles' head from which she did die.   To the information the defendant on arraignment pleaded not guilty.   He was tried, convicted of murder, and his punishment fixed by the jury at life imprisonment.   From the judgment and sentence based thereon the defendant perfected this appeal.

The facts in the case are that the deceased, Panta Lou Liles, was a young white married woman, 20 years of age, the wife of a soldier.   She was brutally murdered by an unknown assailant while she slept alone in the bedroom of her apartment.   The murderer may have gained entrance through a window in the kitchen in the back of her three-room apartment.   The window in the kitchen was found open after the murder was discovered.   He may have made his exit through a door leading from the bedroom into the hall of the apartment.   This door was open at an angle of about 30 degrees when the police officers arrived.   Upon entering the bedroom the murderer ap-

parently assaulted Mrs. Liles about the head which rendered her immediately unconscious and from which she died.

Medical examination of Mrs. Liles' private parts revealed that she may have been raped, though it is a known fact that she entertained a married gentleman friend, a Mr. K——, that night, past the midnight hour. The fact that she may have been raped is predicated upon the removal of some male semen taken from the secretion of the vulva of her body. The record does not reveal whether an analysis of this semen was made as to type; whether type -1-, -2-, -3-, or -4-. Such an analysis of this male semen could have been made for comparison with a specimen of semen taken from the defendant and a specimen taken from Mr. K——. This was not done. By an analysis and comparison, such as this, it could have at least been determined whether the type of semen found in the vulva of the victim was the same type of the defendant, or Mr. K——. It would possibly have eliminated one or both the defendant and Mr. K——, as to the evidence of rape or intercourse with the victim. It might have absolved the defendant of connection with rape of the victim and thus destroyed the motive for murder by the defendant. If the state had made such an analysis as to type of the semen taken from the vulva of the victim and compared it with the semen of the defendant and found it to be of the same type, though not forming the basis for positive identification, it would have been a strong circumstance against the defendant. The defendant, under the circumstances disclosed by the record, would have submitted to such an examination and comparison, since he was without the aid of counsel. This was not done, and hence, the presence of male semen in the vulva of the victim, under the circumstances of this case, forms the first

link in a speculative and prejudicial chain upon which this conviction is based.

Mrs. Liles shared her apartment with a Miss Seaburn, a nurse, who worked at night and slept in the daytime. It was Miss Seaburn's practice to call Mrs. Liles over the telephone about 5:00 o'clock in the morning and awaken her. On May 15, 1945, she called at 5:10 a. m. and at first no one answered. Five minutes later, after repeated calls, a voice answered. Miss Seaburn said it could have been the voice of either a man or a woman. It was not the voice of Mrs. Liles. It was not identified by Miss Seaburn as the voice of the defendant. She became suspicious when the voice failed to properly answer a trick question and she called the police. After the defendant's arrest, the county attorney advised him that a telephone call would be placed to him and he would be asked a question and the county attorney would tell him what to answer. Miss Seaburn put the same trick question over the telephone to the defendant and under instructions from the county attorney she got the same answer from the defendant that she got the night of the murder from the voice that answered the telephone in Mrs. Liles' apartment. But, she said she could not identify the voice that she heard on the morning of May 15th over the telephone, as the voice of the defendant. This feature of the state's case formed another speculative link in this chain of circumstances. However, as to the identification of this defendant, and his guilt, it is a strong circumstance tending to establish that it was not the defendant. Miss Seaburn said the voice over the telephone, the morning of the murder, had the same quality of softness as did Mrs. Liles'. It occurs to us that only someone acquainted with the voice of Mrs. Liles, its quality and tone, under the conditions herein involved, would answer the

telephone and attempt to impersonate her voice. The record shows that this defendant had no acquaintance with the victim upon which to base such an impersonation.

The police received news of Miss Seaburn's call over their radio about 5:38 a. m. They immediately went to 501 Cheyenne in Tulsa. There they found the door leading into Mrs. Liles' apartment from the hall open. Their flashlight revealed the beaten and half-exposed dead body of Mrs. Liles lying on the bed. They found the drawers in the dresser open and things thrown out of them as though burglary had been the motive for the crime.

Thereafter, the police took numerous photographs at the scene of the crime and sought for clues. No fingerprints were found. Some means of positive evidence leading to the identification of the murderer was sought.

In an effort to connect someone with the crime, the police brought in "Ranger", a bloodhound, from the city's kennel. The dog was taken to the scene of the crime, picked up a trail, went across the alley, across a vacant lot into the back of a building at 512 North Boulder, which was around the corner from the place where the crime was committed, and far removed from the defendant's apartment at Haskell and Greenwood streets, the last house next to the brick yard. The use of bloodhounds to trail offenders of the law has been approved in what is known as "the hound dog case", Buck v. State, 77 Okla. Cr. 17, 138 P. 2d 115, containing a learned and historical discussion of this subject by Judge Barefoot. This opinion is in accord with the great weight of authority. In the case at bar, had the dog's trail accorded with the police's detective acumen, no doubt the dog's conduct, on a proper predicate, as defined in Buck v. State, supra, would have been made the basis of a circumstance against this

defendant. But, since the dog's conduct did not accord with their conception of the facts, it formed no part of the state's evidence in chief. The futility of the dog's endeavor, so far as this defendant was concerned, was a part of the defense.

The police, still being without a clue as to the identity of the murderer, apparently searched the court records for a likely suspect. This defendant, among others, having been previously convicted of rape, was called. The defendant, hearing through a friend of the police's desire to contact him, voluntarily and unsuspectingly appeared at the police station in Tulsa on May 22, 1945. Without any charge being lodged against the defendant, he was immediately placed under arrest and imprisoned. He was not informed of the reason for his detention, nor of his then immediate constitutional right to the aid of counsel. Later on that day the defendant was taken from his cell to Captain Stege's office where he was then accused point blank of the commission of the murder of Mrs. Liles, which he positively denied. At no time during an extended interrogation from May 22 to June 5 was the defendant ever advised of his constitutional rights or warned that anything he might say would be used against him in the event of a subsequent trial of the crime of which he was accused. The state attempted to palliate their procedure by bringing out on the trial of the charge later laid against this defendant, that he was in no way whatsoever abused or beaten and that he was treated nice. While in a state of frustration, as no doubt would characterize anyone under the conditions, he attempted to account for his whereabouts on the night of May 14, 1945, and the early morning of May 15th. The state emphasizes this fact as a strong circumstance indicating his guilt. However, this court is of the opinion that only people of

the rare and exceptional gift for remembering places and events could several days later tell with minute accuracy where they had been and what they had done. This member of the court cannot now recall where he was or what he was doing seven days ago, with that definiteness and accuracy, which the officers expected of this Negro defendant who stood before them accused of the crime of murder. It is a circumstance pointing to this defendant's innocence that he promptly and unsuspectingly reported to the police officers upon being informed of their desire to contact him. From May 22 until June 5 the defendant was subjected to almost incessant questioning. During all this period the defendant was not charged with any offense or taken before a magistrate. During all of this period he was not permitted to communicate with anyone; not even his relatives, much less an attorney.

In a further effort to obtain clues, at the scene of the crime, the officers removed the bloody pillow case, the bloody upper half of the sheet, the lower half of the sheet, the gown, the panties the victim wore, and other articles from the bed, including debris from the sheet, and sent them to the division of identification of Federal Bureau of Investigation. Officer Benson testified that he made a trip on Sunday morning, June 3rd, to Benton's room and found a pair of Benton's pajamas hanging in the clothes closet. These pajamas were likewise sent to the division of identification of the F. B. I.

The F. B. I. made an examination of these things and discovered hair on the bed sheet, taken from Mrs. Liles' room, and in the cuff of the pajama pants taken from the room of the defendant, Benton. Mr. Duggins, a special agent for the Department of Justice, testified that in the debris taken from the pajama pants he discovered Negroid hair and one very short red hair (it should be remember-

ed that the victim's hair was red). This hair, it was said, was about 1/50 of an inch in length, barely visible to the naked eye. "It was so small that it was not possible to determine what part of the body, with accuracy, it came from. That is, whether it was a body hair, pubic hair or head hair." Head hair, body hair and pubic hair, having been provided the division of identification of the F. B. I. from the head, body and pubic regions of Benton, Mrs. Liles, and Mr. K——, a comparison was sought to be made, designed to leave the impression with the jury that the 1/50 of an inch red hair came from the body of Mrs. Liles and was in the cuff of the pajama pants of the defendant, Benton. Mr. Duggins, however, stated that "hair identification is not a positive science." He further testified that there was a fragment of hair which possessed Negroid characteristics and which was found on the bed clothing of the victim. As to the red hair found in the pajama pants of the defendant, he said, "We cannot state that this questioned hair came from the victim, we can merely state that they are similar in color, the medulla is similar, the diameter in this particular hair is approximately the same." Then he said "therefore it could have come from that source" (meaning from the victim), "again it could have come from many other sources too." In addition he said that though there were similarities in that small fragment of hair with the victim's, there were also many dissimilarities and because it was so small he could not tell from what portion of the body it came. As to the Negroid hairs found on the bed sheet, he likewise testified that though there were many similarities to hairs taken from the body of Leroy Benton, there were also many dissimilarities.

Docter Leon August Hausman, who the record discloses lived in New Brunswick, New Jersey, a professor

in Rutgers University, a contributor to Encyclopedia Britannica and numerous scientific publications, as well as to the files of the F. B. I., on the subject of hair identification, testified for the defense, using as the basis for his testimony the same hair used by Mr. Duggins of the F. B. I. As to the identification of the red hair found in the pajamas of the defendant, he testified positively that it was his judgment that it did not come from the body of the victim. He further testified in relation to the Negroid hairs found in the debris on the sheet on the victim's bed that it was his opinion that those hairs and the hair taken from the defendant could not have come from the same source and gave as his reason therefor that the hair found on the sheet was larger in diameter and so lightly pigmented and the hair of the defendant in comparison was so much smaller and so much more heavily pigmented that they could not have come from the same source.

Doctor Clarence W. Muehlberger, employed in the Michigan Crime Detection Laboratory, a graduate of the Chicago Institute of Technology with a degree of Bachelor of Science and a Master of Science degree from the University of Wisconsin and a Doctor of Philosophy degree from the same university and a contributor to Doctor L. M. Snyder's recent publication on "Homicidal Investigations", after comparing the same hair presented to Mr. Duggins of the F. B. I., concluded in effect as follows: That you can't determine racial origin from a single hair but the best you can do is to make an estimate of racial origin; that if you don't have much hair upon which to base an examination it is very difficult to even draw a generalization because if you only have a small piece of hair you can't tell how it would have looked if it had been a whole hair, and even then, he says, it would

be most difficult to be absolutely positive about it. In making a comparison of the piece of reddish hair found in the pajama pants of the defendant with the red hair taken from the victim's head, he says: "I found that the known hair of the deceased measured 62½ microns; that is allowing an error of possibly a micron, it may be 61½, and may be 63½, but the measurement was 62½ mircons on the known hair of the deceased. The hair which is compared with it was definitely smaller, and that was from slide Q-27, and the reddish hair on slide Q-27 measured from 48 to 50 microns, depending on whether you measure at one end or nearly the other end, it varied between 48 and 50 microns. So that the hair on slide Q-27 which was said to have been taken from the debris of Leroy Benton's pajama trousers, is definitely smaller than the hair which was photographed from slide K-2 plus K-8, the head hair of the deceased Panta Lou Liles. * * * So that I think in all fairness that suggestion should be made, and I can't find a hair as small as the hair from Leroy Benton's pajama trouser bottoms, which has medulla or core similar to the hair which was taken from the pajama trouser bottoms. That is, I can't find one of the deceased's head hairs that will match it in size and also in medulla." In making a comparison of the debris found on the bed of the deceased with the pubic hair of Mr. K—— and Leroy Benton, he testified that the questioned hair found on the bed clothes more closely resembled Mr. K——'s than it did Benton's. The foregoing evidence in relation to a comparative study of the hair of the victim and the hair found on the bed sheet and pajama pants of the victim and defendant respectively is admittedly so indefinite and so highly speculative as to form no basis whatsoever for identification. **The best** that can be said of it is that though it may cast a shadow of suspicion, it is too highly speculative to be of any prob-

ative value in this case and must, therefore, be eliminated. That brings us to the confession, upon which this conviction must stand or fall. It may be bluntly stated that this conviction cannot stand without the confession.

In this regard the record reveals that on the morning of June 4th, the defendant was taken to the office of Captain Stege where he was questioned. Here, the defendant testified, Officer Stege staged a fake mob demonstration which was overheard by the defendant. The pertinent part of this testimony is as follows:

"Q. During the time that Mr. Stege was questioning you, what, if anything, happened around there and about that vicinity? A. During the questioning by Mr. Stege, I heard some noises on the outside. I don't recall definitely, I couldn't say whether they were shots or what they were, but to me they seemed and sounded like shots. I said to Mr. Stege, 'Mr. Stege, what is that?' Mr. Stege goes to the door and comes back, and he says, 'Probably that damn mob.' Q. What did you say? A. I said 'Mob?' I have been told all along about a mob by different officers, and I became frightened. And Mr. Stege says to me, he said, 'We done all we can to save you, and you are just acting stubborn, and act like you don't care whether you get mobbed, or what happens to you. We want to protect you, and we want you to come clean and tell us what you know about this homicide.' Q. Well, did you tell him you didn't known anything about it? A. I denied it, I told him I didn't know anything about it, and I was doing all I could to help in the investigation. Q. When Mr. Stege told you that it was a mob, did you actually believe it was a mob? A. I actually did, yes, sir. Q. Did you become frightened? A. Yes, sir, I did."

Thereafter, at about 2:30 in the afternoon on June 4th, he was taken to the police chief's office where he was questioned by several officers until approximately 7:30 p. m. At this time he was taken from the chief's office to the county attorney's office in the courthouse where he

again was questioned all night by substantially the same people who had questioned him during the day. This ordeal lasted from about 8:00 in the evening until about 7:30 the next morning. He testified that during this period of interrogation he was not given food, rest, or allowed any sleep but was subjected to a continuous barrage of questions. (It was during this all-night siege that he had the telephone conversation with Miss Seaburn and upon which she was not able to identify him.) This ordeal being unfruitful, he was then taken back to the police station to room 206 where he met Mr. Robbins, another police officer, who had had no part in the prior questioning of the defendant. During the time that he had been in the county attorney's office, room 206 had been especially prepared with enlarged pictures, two or three feet high, all arranged around the room. These pictures depicted the scene of the crime and the murdered victim in minute detail. The defendant said there was a chair sitting in the middle of the room and over it a big light. He was seated in this chair while being questioned. While the defendant was talking to Mr. Robbins, another fake mob demonstration was had on the outside of room 206. The defendant testified in relation to this as follows:

"And he went on to go into details about that, and during that time I heard some noises out in the hall, sounded like scuffling around, somebody scuffling. And I said, 'Mr. Robbins, there is some noises out in the hall. Do you know what they are?" And he said, 'No, I don't, but I will see.' And he went to the door, and I heard him holler down the hall, 'You keep them down there, and I will take care of this boy up here.' Q. Now, Leroy, was it in your mind that there was a mob out there? A. Yes, sir, it was. Q. I think you stated a while ago that all the officers had been telling you from time to time that you were going to be mobbed? A. Mr. Robbins told me, when he came back— Q. When you heard the noises,

what did he say when he came back after that? A. He says to me, he said, 'That is that mob; it looks like you are going to get it. We are just getting tired of fooling with you, it looks like you just want to get mobbed.' He says, 'Now, you come clean and tell us all about this now. You will be lucky to go to trial, and even if you do get to trial, you will probably be mobbed, and so will *you* attorneys.' Q. Well, after that, what did you say to Mr. Robbins? A. Well, I became afraid, and I says, 'Mr. Robbins—' I said, 'Mr. Robbins,' I said, 'If I say I did it, and later on you find the real murderer, what will you do about getting me out of the penitentiary?' Mr. Robbins answered me, and he said, 'Leroy, if such a thing does happen, I will spend the balance of my life trying to get you out of the penitentiary. I will even go to the county attorney and do all I can to get you out, if it costs me my job.' Q. Then what did you say? A. I told him to call the county attorney. Q. You told him to call the county attorney? A. Yes, sir."

Mr. Robbins corroborates the defendant's testimony that he would assist him in obtaining his release from the penitentiary when the real murderer was found and so testified in both the preliminary examination and at the trial. In the preliminary, Officer Robbins testified that Leroy said "Mr. Robbins, suppose I made this confession and got life in the penitentiary and up the road the real murderer was found and arrested, what would you do towards getting me out?" Mr. Robbins said he told him that: "I would do all in my power by going to Dixie Gilmer, the county attorney, to obtain the release" of the defendant. It was then the defendant said he would say he did it and to call the county attorney. This he said he did to avoid the mob. He then said he asked Officer Robbins what he should tell the county attorney when he was asked what he killed Mrs. Liles with and, in relation thereto, he testified as follows:

"Q. Did Mr. Robbins say anything to you about the death weapon? A. Well, from the time I told him to call the county attorney and the time Mr. Simms got over there, we had a discussion, and I asked him, I said, 'Mr. Robbins, what if Mr. Gilmer asks me what I hit the woman with, what am I going to say?' And he said, 'Well, from the looks of the wounds on the woman's head, I would suggest you tell him you used a pipe.' Q. Did he say anything about not telling Mr. Gilmer about your conversation? A. He told me, he said, 'Of course, you don't have to say anything to the county attorney concerning these suggestions I made to you; just leave him to think that that was your own idea.' Q. All right. Now then, Mr. Simms came, did he? A. Yes, sir, he did."

Thereafter Mr. Gilmer, the county attorney, finally arrived at room 206 and the defendant said with the aid of the pictures and with what the officers had suggested to him during the long night of inquisition from May 22 to June 5, he began to try and reconstruct the crime. In relation to this he testified as follows:

"Q. And what happened when you began to try to tell Mr. Gilmer about these scenes? A. Well, I just thought Mr. Gilmer was going to come over and ask me if I did it, and I would say yes, and that would be all there was to it. Mr. Gilmer asked me several other questions that were confusing, and naturally I looked around trying to get some information as to the answer to his question, from the pictures. Mr. Gilmer noticed that and walked over and turned the pictures facing the wall."

The striking feature of this part of inquisitorial picture, which this case presents, is that though a confession was hoped for, labored for and anticipated, after the gruelling interrogations, a stenographer was not used to reduce to writing one word of what the defendant said when the expected confession finally came. At this stage of the proceedings, Mr. Gilmer went to get a stenographer and told Officer Benson to question the defendant about

the details. He said that he did this and as soon as Mr. Gilmer and the stenographer returned he went out; that he did not know whether the stenographer went in or out; that he had no conversation with Mr. Gilmer as to what the defendant told him about the details. He did not stay to see whether the defendant repeated the details which he had delineated to him. He did not stay to be of any assistance to the county attorney in helping him obtain from the defendant reconstruction of the details of the crime. He said: "I had gone down the room—to the rest room". This conduct of Officer Benson is amazingly contrary to human nature. It occurs to us that the sheer force of curiosity would overcome the pangs of nature. We believe that he would have remained to see whether the defendant's confession made to him followed the same pattern of detail as that given to the county attorney, if the defendant actually confessed to him. But no, he went to the toilet and had no further connection with the taking of the confession. The defendant says he never at any time confessed to Mr. Benson. To say the least, Officer Benson's conduct gives some credence to the defendant's denial.

It is also a salient feature of this case that the record does not show Officer Robbins made any attempt to reduce this confession to writing; that Officer Benson did not, and, that Mr. Gilmer did not. Why Mr. Gilmer made no use of the stenographer does not appear. This conduct of the officers substantiates defendant's story of what happened.

Moreover, the uncontradicted record further reveals that the officers were not satisfied with the form and sufficiency of the confession. They too thought it was invalid for some reason, so, they took the defendant to Okmulgee and there placed him in jail, ostensibly to make

the defendant believe it was to avoid mob violence, but, where a renewed attempt to obtain another confession was made. Again, they took him to Kansas City, where he was subjected to a lie detector test. The record does not show the result of this unlawful excursion, but, like the use of "Old Ranger", the bloodhound, if it had been favorable, the state would not have discarded it. Then, they took the defendant to McAlester where in another and final effort, through a Negro whose death sentence had been reduced to life imprisonment, they sought to induce the defendant to confess without qualifications or limitations. This conduct of the officers is without legal justification. It reflects upon the character of the defendant's alleged confession and the state's belief as to its validity. If it had not been induced by fear of mob violence; if it had not been obtained under duress; if it had not been induced by a promise of protection from violence and later release when the true perpetrator was apprehended, then why was it necessary to go to such pains to obtain further confession? The answer to this question is obvious. Apparently the officers were seeking a second confession free from qualifications. In this connection, the attitude of the county attorney, Mr. Gilmer, police chief, Hyatt, and Officer Benson, following the so-called confession, casts the shadow of doubt upon the validity of the entire proceedings and their undisclosed knowledge in relation thereto. It lends credence to the testimony of the defendant. Though the police commissioner, the chief of police, the county attorney and the assistant county attorney took part in the grilling to which the defendant was subjected, not one of them took the witness stand to testify in support of the circumstances under which the confession was obtained. They were willing to accept the fruits of this procedure but unwilling to support it by their testimony. What the defendant said

amounted to an impeachment of the official conduct of these officers in the administration of justice. It was their duty to deny it, if it were not true.

Furthermore, Mr. Simms, the assistant county attorney and one of the prosecutors in the case, did not deny the conversation the defendant said he had with him immediately after the so-called confession was made to Mr. Gilmer, as follows, to wit:

"Q. What did Mr. Simms state, if anything, to you? A. Mr. Simms asked me, he said, 'Leroy, now that you have told it, don't you feel better?' I told him, 'Truthfully, Mr. Simms, I feel worse, because the whole thing was a lie'."

This uncontradicted statement by the defendant when considered under the circumstances under which it was made and the time it was made, also lends credence to the invalidity of the confession and to the manner in which the defendant testified it was obtained.

There is, of course, a sharp conflict in the testimony of the defendant and Officers Stege, Benson, Robbins, and Mrs. Cook the stenographer, as to the threat of mob violence. But, these nor any of the other officers who participated in the inquisition of the defendant had the effrontery to testify the defendant was not denied constitutional rights sacred to every American, whether justly or unjustly accused. The conflict that existed between the defendant and the officers' testimony in this case is characteristic of cases where the investigation was conducted as in the instant case, under "sweat box" methods. Courts do not resolve any of the disputed questions of fact, obtained under such circumstances. Such disputes are an inescapable consequence of "star chamber" inquisitorial practices. It is the natural consequence of such secret proceedings that the weight of the evidence be

stacked against the accused. Where the accused is hopelessly outnumbered, bereft of friends, and without the aid of counsel, charged with a brutal crime and has a prior record upon which substantial suspicion may be based, what else can we expect, under such conditions? To avoid these consequences, constitutional inhibitions and safeguards have been erected against such proceedings. The Supreme Court of the United States came to the same conclusion in Ashcraft v. Tennessee, 322 U. S. 143, 64 S. Ct. 921, 925, 88 L. Ed. 1192, wherein it said:

"In reaching our conclusion as to the validity of Ashcraft's confession we do not resolve any of the disputed questions of fact relating to the details of what transpired within the confession chamber of the jail or whether Ashcraft actually did confess. Such disputes, we may say, are an inescapable consequence of secret inquisitorial practices. And always evidence concerning the inner details of secret inquisitions is weighted against an accused, particularly where, as here, he is charged with a brutal crime, or where, as in many other cases, his supposed offense bears relation to an unpopular economic, political, or religious cause."

The only substantial evidence upon which to base a conviction in this case is that of the confession.

This brings us to the decisive issues of the case. First, was the defendant denied constitutional rights incident to a fair and impartial trial? Second, is the confession of such a free and voluntary character as to be admissible in evidence and to support this conviction under due process?

Under the Bill of Rights of the Constitution of the State of Oklahoma, article II, § 20 provides (referring to defendant): "He shall have the right to be heard by him-

self and counsel." Under Title 22 O. S. A. § 13, it is provided that in a criminal action, the defendant is entitled:·

"1. To a speedy and public trial.

"2. To·be allowed counsel, as in civil actions, or to appear and defend in person and with counsel. * * *"

The uncontradicted evidence in this record discloses that the defendant was denied the right to counsel in all stages of the proceedings from the date of his arrest on May 22 to June 11th, the date the charge of murder was filed against him. Such denial constitutes a violation of both the State and Federal Constitutions. In Sutton v. State, 35 Okla. Cr. 263, 250 P. 930, 933, this court quoting from Polk v. State, 26 Okla. Cr. 283, 224 P. 194, said:

" 'Under our laws every person accused of felony is entitled to aid of counsel at every stage of the proceedings, whether imprisoned or admitted to bail, and refusal of opportunity to procure such counsel amounts to a deprivation of a right essential to his safety.' "

In Howington v. State, 30 Okla. Cr. 243, 235 P. 931, 933, this court said:

"A denial of a constitutional right to a person prosecuted for a crime is prima facie prejudicial."

In syllabus (6) of Howington v. State, supra, this court said:

"Where it appears on appeal that a defendant has been denied a right guaranteed by the Constitution, such showing requires a reversal, unless the record clearly shows that the right was waived, or that no injury could have resulted to the accused by reason of such denial."

Herein, the record discloses that the defendant made. numerous attempts to communicate with sources of aid, outside the jail, but was prevented from doing so. It further shows that he did not waive his right to aid of coun-

sel. This constitutional right to counsel clearly imports the right to aid thereof upon arrest and during the inquisitorial proceedings when the confession was taken. It is not limited to aid of counsel at the time of the preliminary or the trial. The law clearly provides that an accused shall be entitled to the aid of counsel at every stage of the proceedings and a refusal of opportunity to procure such counsel amounts to a deprivation of a right essential to his safety and constitutes the denial of a sacred constitutional right. Where it appears that the defendant has been denied such a right, such showing requires a reversal, unless the record clearly shows that the right was waived, or that no injury could have resulted to the accused by reason of such denial. It cannot be disputed, in the face of the record, that injury resulted to the accused by reason of the denial of the aid of counsel. With the aid of counsel the defendant would not have been subjected to the "long night" of inquisitorial grilling and the fake demonstration of mob violence designed to break down his physical resistance. Surely no one would be so bold as to say that the lack of counsel did not result in injury to this defendant. Such a right was sacred, not only to this defendant, but must be preserved to every citizen of this state and of the United States, and, officers of the law must be required to regard it with that high degree of sanctity in which it is held by the people and the judiciary throughout the land.

The delay, herein involved, constitutes a violation of the defendant's statutory rights as defined by Title 22 O. S. A. § 181 as follows, to wit:

"The defendant must, in all cases, be taken before the magistrate without unnecessary delay."

Said delay, on the part of the officers, is defined as a misdemeanor under the provisions of Title 21 O. S. A.

§ 534. Likewise, this delay involves a violation of the Bill of Rights of the Constitution of the State of Oklahoma, article II, § 7, which provides:

"No person shall be deprived of life, liberty, or property, without due process of law."

Under these provisions it was the duty of the arresting officers to have taken the defendant before a magistrate without delay. See Lyons v. State, 77 Okla. Cr. 197, 138 P. 2d 142, 148, 140 P. 2d 248, wherein this court, in speaking of the constitutional rights of the defendant, said:

"No peace officer should violate these rights, or permit them to be violated, and it is just as much the duty of the officers to protect the rights of defendants as it is to ferret out crime. It is not the right or the duty of an officer to secure from one whom he has arrested and has in his custody, an involuntary confession by the use of force, threats, violence or promises of leniency."

The Lyons case, supra, further quoted with approval from the Supreme Court of Iowa in State v. Thomas, 193 Iowa, 1004, 188 N. W. 689-695, wherein it was said:

"* * * If a crime has been committed, an officer of the law may properly apprehend and restrain of his liberty any person charged therewith for whose arrest he holds a warrant, and even without a warrant he may arrest one who commits a public offense in his presence. And if a public offense has been in fact committed by some one, and the officer has reasonable ground for believing that any given person is guilty of it, he may properly arrest such person without warrant.

"An arrest being lawfully made, it becomes the duty of the officer to promptly produce his prisoner to the proper magistrate to be dealt with according to law. Code, tit. 25, cc. 10 and 11. But it is not within the province of the public prosecutor or sheriff or policeman or detective or of all together to assume the guilt of a person not

under arrest and for whose apprehension they hold no writ and restrain him of his liberty or subject him to the indignity of inquisitorial examination, and grill him by methods which pertain to that modern instrument of torture known as the 'sweat box.' The mere fact that those who assume such authority and engage in such practices are public officers does not exonerate them from the charge of violating the law of which they are the sworn defenders or differentiate them in any legal sense from the mob. If the sheriff and county attorney in this case had reasonable ground to believe defendant was guilty of the crime charged, it was, as we have already indicated, within the scope of their duty and authority to arrest him and produce him before the magistrate, where an examination could be had in an orderly and lawful way, and the rights of the state, on the one hand, and of the accused, on the other, could be properly protected. Instead of this, they constituted themselves a tribunal unknown to the law and proceeded without warrant to subject the man to a secret examination, from which his friends and his counsel were carefully excluded. They assumed his guilt, and refused to credit his denials and his protestations of innocence, or to accept anything he might say in his own behalf until they had extorted from him the alleged confession. Such proceedings are without excuse or justification, and to tolerate them or to ignore them without rebuke is to bring reproach upon the law and convert the administration of justice into an engine for the perpetration of rank injustice."

What the Iowa Supreme Court said, and this court quoted with approval, can be applied with equal force to the case at bar. Here, no attempt was made to properly charge and arraign this defendant for some 20 days, during which time he was subjected to "star chamber" and "sweat box" sessions of the police court of inquisition in Tulsa, Kansas City, Missouri, Okmulgee and McAlester, Oklahoma; far removed from the magistrate having jurisdiction for arraignment. In condemning the failure to take the defendant before a magistrate without

delay and in taking the defendant on these excursions, conducted without authority of law, this court is not entirely without precedent. The Supreme Court of the United States, in the case of Ward v. State of Texas, 316 U. S. 547-555, 62 S. Ct. 1139, 1142, 86 L. Ed. 1663 said:

"The person making the arrest must immediately take the person arrested before the magistrate if the arrest is made without a warrant."

In the body of the opinion, the court comments on the fact that the officers, in the Ward case, made no effort to secure a warrant and did not take the defendant to the nearest magistrate and said:

"The effect of moving an ignorant Negro by night and day to strange towns, telling him of threats of mob violence, and questioning him continuously is evident from petitioner's statement to County Attorney Rolston that he would be glad to make any statement that Rolston desired. Disregarding petitioner's claims that he was whipped and burned, we must conclude that this confession was not free and voluntary but was the product of coercion and duress, that petitioner was no longer able freely to admit or to deny or to refuse to answer, and that he was willing to make any statement that the officers wanted him to make.

"This Court has set aside convictions based upon confessions extorted from ignorant persons who have been subjected to persistent and protracted questioning, or who have been threatened with mob violence, or who have been unlawfully held incommunicado without advice of friends or counsel, or who have been taken at night to lonely and isolated places for questioning. Any one of these grounds would be sufficient cause for reversal. All of them are to be found in this case.

"The use of a confession obtained under such circumstances is a denial of due process and the judgment of conviction must be reversed."

The foregoing language of the Supreme Court of the United States fits the factual situation confronting this court in the case at bar like hand in glove. Its applicability is inescapable, particularly to the actions of the officers in moving this defendant from place to place. In construing similar provisions of the Federal statutes relative to the defendant's constitutional rights to be charged and immediately taken before a magistrate, the Supreme Court, in United States v. McNabb, 318 U. S. 332, at page 342, 63 S. Ct. 608, at page 614, 87 L. Ed. 819, at page 825:

"Similar legislation, requiring that arrested persons be promptly taken before a committing authority, appears on the statute books of nearly all the states.

"The purpose. of this impressively pervasive requirement of criminal procedure is plain. A democratic society, in which respect for the dignity of all men is central, naturally guards against the misuse of the law enforcement process. Zeal in tracking down crime is not in itself an assurance of soberness of judgment. Disinterestedness in law enforcement does not alone prevent disregard of cherished liberties. Experience has therefore counseled that safeguards must be provided against the dangers of the overzealous as well as the despotic. The lawful instruments of the criminal law cannot be entrusted to a single functionary. The complicated process of criminal justice is therefore divided into different parts, responsibility for which is separately vested in the various participants upon whom the criminal law relies for its vindication. Legislation such as this, requiring that the police must with reasonable promptness show legal cause for detaining arrested persons, constitutes an important safeguard—not only in assuring protection for the innocent but also in securing conviction of the guilty by methods that commend themselves to a progressive and self-confident society. For this procedural requirement checks resort to those reprehensible practices known as the 'third degree' which, though universally rejected

as indefensible, still find their way into use. It aims to avoid all the evil implications of secret interrogation of persons accused of crime. It reflects not a sentimental but a sturdy view of law enforcement. It outlaws easy but self-defeating ways in which brutality is substituted for brains as an instrument of crime detection. A statute carrying such purposes is expressive of a general legislative policy to which courts should not be heedless when appropriate situations call for its application.

"The circumstances in which the statements admitted in evidence against the petitioners were secured reveal a plain disregard of the duty enjoined by Congress upon Federal law officers. Freeman and Raymond McNabb were arrested in the middle of the night at their home. Instead of being brought before a United States Commissioner or a judicial officer, as the law requires, in order to determine the sufficiency of the justification for their detention, they were put in a barren cell and kept there for fourteen hours. For two days they were subjected to unremitting questioning by numerous officers. Benjamin's confession was secured by detaining him unlawfully and questioning him continuously for five or six hours. The McNabbs had to submit to all this without the aid of friends or the benefit of counsel. The record leaves no room for doubt that the questioning of the petitioners took place while they were in the custody of the arresting officers and before any order of commitment was made. Plainly, a conviction resting on evidence secured through such a flagrant disregard of the procedure which Congress has commanded cannot be allowed to stand without making the courts themselves accomplices in wilful disobedience of law."

See, also, Malinski v. New York, 324 U. S. 401, 65 S. Ct. 781, 89 L. Ed. 1029, wherein the Supreme Court held: Where the defendant was not allowed to see a lawyer, though he asked for one, or any friends, other than one charged with participation in the robbery, whereupon after being held from 8:00 a. m. to 6:00 p. m. he confessed, although he was not subjected to more than occasional

questioning or anything except his own apprehension that he might be beaten, such confession will be deemed coerced, involuntary and its use a violation of the Due Process Clause of the Constitution of the United States. Neither of the foregoing cases are as strong as the case at bar. Applying the principles announced in the McNabb and Malinski cases to the case at bar, this court cannot permit this conviction to stand without making itself an accomplice in willful disobedience of this defendant's constitutional and statutory rights.

It is apparent from this record that the confession herein relied upon can in no sense be said to have been free and voluntary. Neither can it be said that it was unconditional or made without reservations or qualifications, or, that it reflected the intention of the defendant to admit his guilt of the crime charged. It appears from the record that it was obtained under threats of mob violence after long hours of interrogation without rest, food, or sleep, until the mental and physical powers of the defendant were broken down and in such weakened and fearful condition he became a willing victim under the induction of a promise of benefit. We are inclined to the belief that the confession involved in the case at bar falls far short of reaching the requirements of what might be regarded as a confession, but, be that as it may, the record discloses clearly that it was obtained upon a promise of benefit and therefore it was inadmissible as was said by Judge Jones in Pressley v. State, 71 Okla. Cr. 436, 112 P. 2d 809, 813:

"Confession induced by a promise of benefit or a threat of harm made to a defendant by a prosecuting attorney or an officer having him in custody will be deemed an involuntary confession and will be inadmissible in evidence."

Likewise, Judge Barefoot in Williams v. State, 65 Okla. Cr. 336, 86 P. 2d 1015, 1018, said:

"The rule is well established that confessions induced by a promise of benefit or a threat of harm, made to the defendant by a prosecuting attorney or an officer having him in custody, or by anyone having authority over him, or made by a private person in the presence of one whose acquiescence may be presumed, will be deemed involuntary, and will be inadmissible as evidence. * * *

" 'The doctrine, in its essence and divested of its technicalities, is that a defendant's confession is admissible in evidence against him if made freely and without the hope of benefit to his cause; otherwise it is rejected, since its purpose may have been to secure such benefit rather than to disclose the truth.'

" 'The real question is whether there has been any threat or promise of such a nature that the prisoner would be likely to tell an untruth from the fear of the threat, or hope of profit from the promise.'

"The above principles have been followed by this court in many decisions and constitute the general rule as announced by practically all of the states. Kearns v. State, 14 Okla. Cr. 142, 168 P. 242; Taylor v. State, 27 Okla. Cr. 165, 225 P. 988; Miller v. State, 13 Okla. Cr. 176, 163 P. 131, L. R. A. 1917D, 383; Bram v. United States, 168 U. S. 532, 18 S. Ct. 183, 42 L. Ed. 568."

The record in this case undisputably shows that Officer Robbins promised Benton that if he would make a statement and later if the real murderer was apprehended he would do all in his power to get Benton out of the penitentiary. Mr. Robbins testified that such a promise was made and Leroy Benton relied upon it. These facts, we believe, come squarely within the rules announced in Pressley v. State and in Williams v. State, supra. We are convinced that this confession was an involuntary one, under the record, and renders the same wholly inadmis-

sible against this defendant. As was said in Balding v. State, 77 Okla. Cr. 36, 138 P. 2d 132, 135, wherein this court quoted from Williams v. State, supra:

"Involuntary confessions are rejected for two reasons. The first is that to secure a confession from a defendant either through threats or promises violates the constitutional provision protecting a person against being forced to give evidence which will tend to incriminate him (Constitution, article 2, section 21); secondly, because they are testimonially unreliable and untrustworthy.

"In Coleman v. State, 70 Okla. Cr. 246, 104 P. 2d 1004, 1008, 105 P. 2d 431, it is held: 'A confession in order to be admissible must be free and voluntary. It must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, nor by the exertion of any improper influences.' See, also, Mays v. State, 19 Okla. Cr. 102, 197 P. 1064; Taylor v. State, 27 Okla. Cr. 165, 225 P. 988."

Moreover, the proceedings resorted to in this case to obtain the confession and conviction of the defendant did not meet the requirements of due process of law. The circumstances of this case fall squarely within the facts involved in Chambers v. State of Florida, 309 U. S. 227, 60 S. Ct. 472, 477, 84 L. Ed. 716, wherein a white man had been robbed and murdered and a number of Negroes were arrested and questioned. Defendant Chambers, being questioned over a period of five days, held incommunicado without friends, advisors, or counsellors, finally broke down and made a confession. The Supreme Court of the United States held that the same was in violation of the constitutional provision of due process under the 14th Amendment and therefore could not be sustained. In so holding, Mr. Justice Black said:

"The determination to preserve an accused's right to procedural due process sprang in large part from knowl-

edge of the historical truth that the rights and liberties of people accused of crime could not be safely entrusted to secret inquisitorial processes. The testimony of centuries, in governments of varying kinds over populations of different races and beliefs, stood as proof that physical and mental torture and coercion had brought about the tragically unjust sacrifices of some who were the noblest and most useful of their generations. The rack, the thumbscrew, the wheel, solitary confinement, protracted questioning and cross questioning, and other ingenious forms of entrapment of the helpless or unpopular had left their wake of mutilated bodies and shattered minds along the way to the cross, the guillotine, the stake and the hangman's noose. And they who have suffered most from secret and dictatorial proceedings have almost always been the poor, the ignorant, the numerically weak, the friendless, and the powerless. * * *

"Here, the record develops a sharp conflict upon the issue of physical violence and mistreatment, but shows, without conflict, the drag net methods of arrest on suspicion without warrant, and the protracted questioning and cross questioning of these ignorant young colored tenant farmers by State officers and other white citizens, in a fourth floor jail room, where as prisoners they were without friends, advisors or counselors, and under circumstances calculated to break the strongest nerves and the stoutest resistance. * * *

"For five days petitioners were subjected to interrogations culminating in Saturday's (May 20th) all night examination. Over a period of five days they steadily refused to confess and disclaimed any guilt. The very circumstances surrounding their confinement and their questioning without any formal charges having been brought, were such as to fill petitioners with terror and frightful misgivings. * * *

"We are not impressed by the argument that law enforcement methods such as those under review are necessary to uphold our laws. The Constitution proscribes such lawless means irrespective of the end. And this argu-

ment flouts the basic principle that all people must stand on an equality before the bar of justice in every American court. Today, as in ages past, we are not without tragic proof that the exalted power of some governments to punish manufactured crime dictatorially is the handmaid of tyranny. Under our constitutional system, courts stand against any winds that blow as havens of refuge for those who might otherwise suffer because they are helpless, weak, outnumbered, or because they are non-conforming victims of prejudice and public excitement. Due process of law, preserved for all by our Constitution, commands that no such practice as that disclosed by this record shall send any accused to his death. No higher duty, no more solemn responsibility, rests upon this Court, than that of translating into living law and maintaining this constitutional shield deliberately planned and inscribed for the benefit of every human being subject to our Constitution—of whatever race, creed or persuasion."

In the Chambers case, the defendant was only held for a period of five days, culminating in one all night examination resulting in a confession, but in the case at bar, this defendant was held from May 22nd until June 11th before being charged with a criminal offense or before being taken before a magistrate, and during all of which time, as this record reveals, he was subjected to inquisitorial processes without friends and the aid of counsel. He finally broke under the conditions to which he was subjected and under the promise of protection against a mob and release in the event of the apprehension of the true murderer, he confessed. This court has repeatedly held that confessions obtained under such conditions are inadmissible in evidence. We so hold with reference to the confession herein involved. We hope this court may always rise to its high duty and solemn responsibility of standing as a bulwark against the denial of due process of law, regardless of what may be the race,

color, or creed of an accused. Only by striking down such encroachments upon the rights of one of our citizens, when they appear as in this record, can we make secure to all the citizens the enjoyment of this sacred constitutional guaranty. In no other way can this court remain free from the charge of waiving the Constitution in one hand and denying it in the other. See Haley v. Ohio, 68 S. Ct. 302; also see Lee v. Mississippi, 68 S. Ct. 300, 301, wherein the court said:

"The due process clause of the Fourteenth Amendment invalidates a state court conviction grounded in whole or in part upon a confession which is the product of other than reasoned and voluntary choice."

Measuring the record herein before us by these principles, we are of the opinion that the failure of the officers of Tulsa county, Oklahoma, to accord this defendant his fundamental constitutional and statutory rights, and in pursuing the procedure herein followed to obtain the confession, amounts to a violation of the 14th Amendment of the Constitution of the United States and article II, § 7 of the Bill of Rights of the Constitution of the State of Oklahoma, as well as the safeguards enacted by the Legislature to secure their enforcement. For all the foregoing reasons the judgment herein is reversed, vacated, and set aside. If the state has not obtained competent evidence in addition to that disclosed by this record, then the district court of Tulsa county is ordered forthwith to dismiss the prosecution and discharge the defendant.

BAREFOOT, P. J., and JONES, J., concur.